[Civ. No. 56996. Second Dist., Div. Four. Aug. 29, 1980.]

ARTHUR F. GORE, Plaintiff and Appellant, v.
BOARD OF MEDICAL QUALITY ASSURANCE,
Defendant and Respondent.

188

COUNSEL

Selwyn & Capalbo, Herbert E. Selwyn and Sandra Kamenir for Plaintiff and Appellant.

George Deukmejian, Attorney General, and Lawrence C. Kuperman, Deputy Attorney General, for Defendant and Respondent.

OPINION

HOLMES, J.*—Petitioner, a licensed physician and surgeon, was charged in a disciplinary proceeding by respondent board with gross negligence in his postoperative treatment of a patient, Doris E. D'Abusco, by failing to diagnose, monitor and take sufficient steps to remedy a fluid and salt imbalance in the patient. After hearing, the administrative law judge prepared a proposed decision, exonerating petitioner from "gross" negligence; but it was not adopted by respondent board, which rendered a decision finding petitioner "grossly negligent" and suspending his license for one year, subject to stay on the condition that he take an educational course in managing electrolyte imbalances.

Petitioner sought a writ of mandate in superior court. During trial, before Judge Charles Phillips, a declaration was filed in which Edward Zalta, M.D., stated that Barry Warshaw, M.D., member of the Division of Medical Quality that decided the administrative case, had informed him that Warshaw originally had voted to find petitioner merely negligent, but changed his vote to gross negligence; and that prior to the vote, he had spoken with several "Ob-Gyn friends" (obstetrics-gynecology), and told them the specifics of the Gore case and asked their opinions.

Judge Phillips ordered a peremptory writ of mandate to issue requiring the board to dismiss the accusation or, in the alternative, to "redecide" the case without participation by Dr. Warshaw. Thereafter, respondent board, without Dr. Warshaw's participation, made the same findings with regard to gross negligence as in its original decision and again suspended petitioner's license for one year. On this occasion, how-

---

*Assigned by the Chairperson of the Judicial Council.

ever, the board changed the conditions required for stay of suspension of license to provide that petitioner must successfully pass an oral clinical examination in the management of fluid and electrolyte imbalances before the stay would be operative.

Petitioner sought and was denied a writ of mandate in the superior court. This appeal followed.

*The Administrative Procedure Was Valid*

■ There is no merit in petitioner's claim that the administrative procedure prescribed by section 11517, subdivision (c) of the Government Code is unconstitutional because it authorizes respondent board to decide the case for itself if the proposed decision by the administrative judge is not adopted.

The requirements of due process of law are fully met where, as here, the licensee was accorded judicial review of the administrative decision in which the court weighed the evidence and rendered its independent judgment on the merits. (*Moran* v. *Board of Medical Examiners* (1948) 32 Cal.2d 301, 308 [196 P.2d 20]; *Murphy* v. *Board of Medical Examiners* (1946) 75 Cal.App.2d 161, 161-162 [170 P.2d 510]; *Hohreiter* v. *Garrison* (1947) 81 Cal.App.2d 384, 401-402 [184 P.2d 323]; *Tringham* v. *State Board of Education* (1958) 50 Cal.2d 507, 509 [326 P.2d 850].)

*Garza* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312 [90 Cal. Rptr. 355, 475 P.2d 451], relied upon by petitioner, is not germane. Therein it was held that an administrative hearing officer's proposed decision is entitled to great weight because of his opportunity to observe the witnesses and weigh their testimony in light of their demeanor. The record in the instant case clearly shows that the trial judge took into consideration the fact that the administrative law judge proposed to render a decision holding that petitioner's conduct, although negligent, was not grossly negligent; but that this conclusion was based upon a mistaken belief of the administrative law judge that, under the circumstances of this case, "gross" negligence would have required petitioner's conduct to be a cause of the patient's death. Credibility of the witnesses was not involved in the trial court's conclusion that the proposed deci-

sion of the administrative law judge was properly rejected by the board.[1]

### ■ *Effect of Leading Questions Is Not Reviewable Here*

Dr. Gerber, an expert medical witness, gave damaging testimony against petitioner at the administrative hearing, some of it elicited by leading questions. Petitioner contends that in order to properly evaluate that testimony it was necessary for the superior court to observe the demeanor of the witness. No reason is suggested. Expert testimony given in response to leading questions commonly is reviewed without benefit of personal observation of the witness. (E.g., *People* v. *Campbell* (1965) 233 Cal.App.2d 38, 44 [43 Cal.Rptr. 237]; *Imperial W. Co. No. 1* v. *Irrigation Dist.* (1923) 62 Cal.App. 286, 292-293 [217 P. 88]; *Latky* v. *Wolfe* (1927) 85 Cal.App. 332, 346 [259 P. 470]; see Witkin, Cal. Evidence (2d ed. 1966) pp. 1073-1074.) The superior court must be deemed to have weighed the testimony of Dr. Gerber in relation to the manner of his interrogation. Furthermore, no timely objection was voiced at the administrative hearing to the form of the questions asked and no motion to strike was made.

### *Conduct of Dr. Warshaw Not Prejudicial*

■ Petitioner suggests that the improper conduct of Dr. Warshaw, above described, may have tainted the entire membership of the Division of Medical Quality that rendered the decision of respondent board.

At the superior court trial of petitioner's second application for a writ, petitioner was at liberty to show, if he had any basis, that Dr. Warshaw's conduct had influenced other members of the hearing panel; but no such evidence has been pointed out and we know of none in the record. Judge Phillips ordered the board to dismiss the administrative proceeding or, in the alternative, to "redecide" the case without Dr.

---

[1]For this reason it is not necessary to explore the question of whether the superior court, in exercising its independent judgment on the weight of the evidence, is obligated to accord to a proposed but rejected administrative hearing officer's decision the weight to which it is entitled when reviewed by the substantial evidence standard. (See, Code Civ. Proc., § 1094.5, subd. (c); *Garza* v. *Workmen's Comp. App. Bd., supra,* at p. 317; *Rogers* v. *Carleson* (1973) 30 Cal.App.3d 54, 63 [106 Cal.Rptr. 140]; *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 496-497 [95 L.Ed. 456, 472, 71 S.Ct. 456]; *Lamb* v. *Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 274, 280-281 [113 Cal.Rptr. 162, 520 P.2d 978].)

Warshaw's participation. That order implied a finding that the hearing panel was not disqualified to make a decision because of Dr. Warshaw's indiscretion. Judge Phillips' said determination was part of the record before the superior court on the second mandate proceeding, wherein the board's decision was upheld. This implies a finding, on the second trial, here reviewed, that Dr. Warshaw's conduct did not taint the objectivity of the panel.

■ Unauthorized taking of evidence by a court or jurors outside the courtroom is a serious breach of duty that may void a verdict or judgment (*Siemsen* v. *Oakland, S. L., & H. Electric Ry.* (1901) 134 Cal. 494, 498 [66 P. 672]; 4 Witkin, Cal. Procedure (2d ed. 1971) § 251, p. 3063.) However, if it be shown that the circumstances negative any real likelihood of prejudice, such irregularity is not ground for reversal. (*Kimic* v. *San Jose-Los Gatos etc. Ry. Co.* (1909) 156 Cal. 379, 395-400 [104 P. 986].) ■ Nothing in the record indicates that petitioner contended in superior court that Dr. Warshaw's improper conduct affected the other members of the Division of Medical Quality. Said contention, made on appeal for the first time, is impermissible, especially in the absence of evidence to support it.

*The Administrative Proceeding Was Not Barred by Laches*

■ Petitioner claims that his defense to the accusation was prejudiced by his loss of recollection of the pertinent events, which occurred more than four years before commencement of the board's proceeding. Although petitioner earnestly advanced his claim of laches during the administrative hearing, there was no express finding on the issue by the board. Petitioner did not plead or argue laches as ground for relief in the superior court. It is doubtful that the issue is properly before us. However, the decision of the board may fairly be viewed as including an implied finding against the defense of laches and the superior court expressly found that the findings of the board are true. We therefore address ourselves to the issue.

The record does not disclose when the board learned or should have learned of the circumstances alleged in the accusation as a cause of complaint against petitioner. It does disclose that a medical malpractice suit was commenced against petitioner and others on behalf of the minor children of Mrs. D'Abusco and that it was settled for a sum substantially in excess of $3,000 without trial. The board is required by section 800 of the Business and Professions Code to keep a record of all

such settlements that exceed $3,000. Without better evidence, it may fairly be assumed that the board or its staff first learned of the incident on which the instant proceedings are based when respondent board was informed of settlement of the malpractice suit.

The record does not show when the board received that information or how soon thereafter the accusation was filed. Criticism of board delay in commencing the administrative proceeding should be premised on the time when the board learned or should have learned of the facts on which to base its accusation. (*Gates* v. *Department of Motor Vehicles* (1979) 94 Cal.App.3d 921, 925 [156 Cal.Rptr. 791].) The superior court approved settlement of the minors' malpractice suit on April 18, 1975.[2] There is no evidence that the 12 months elapsing between the order approving settlement and commencement of the accusatory proceeding by the board's staff in April 1976 was unreasonable.

No prejudice to petitioner from preaccusatory delay is shown. Included in the record of the administrative hearing is a deposition given by Dr. Gore on May 1, 1973, in the malpractice case. It reflects the same inability of petitioner to remember, at that time, the details of his management of Mrs. D'Abusco's postoperative care in January 1973 that is reflected by his testimony in the administrative hearing in the latter part of 1976.

### The Judgment Is Supported by Substantial Evidence

The trial court did not state whether its decision was reached on a preponderance of the evidence or, as petitioner contends it must be, on "convincing proof to a reasonable certainty." However, petitioner concedes that his burden on this appeal is to show that no substantial evidence supports the judgment of the superior court. In this he is correct. (Code Civ. Proc., § 1094.5, subd. (c); *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32 [112 Cal.Rptr. 805, 520 P.2d 29]; *Lacy* v. *California Unemployment Ins. Appeals Bd.* (1971) 17 Cal.App.3d 1128, 1134 [95 Cal.Rptr. 566].)

The superior court found that the weight of the evidence supports the finding that petitioner was grossly negligent in the postoperative treat-

---

[2]We take judicial notice of the date of filing of the superior court's order approving the settlement. The record does not show when inquiry was undertaken by the board into the circumstances giving rise to the malpractice suit.

ment of the patient when he failed to take reasonable steps to remedy a fluid and salt imbalance. There is substantial evidence to support that finding.

Nonparty expert medical witnesses were produced by each party at the administrative hearing. Dr. Gore also testified on his own behalf. All based their testimony on the hospital chart covering the time from Mrs. D'Abusco's admittance on January 12 to her death on January 19, 1972. The evidence supporting the trial court's judgment may be summarized as follows:

Dr. Gore performed a hysterectomy on the patient on January 13th and was in charge of her postoperative care thereafter. By January 16th, the patient had developed a paralytic ileus, preventing proper absorption of nutriments from her gastrointestinal tract and causing distension of her abdomen and persistent vomiting. Petitioner treated this condition by introducing a Levine tube into her stomach to suction off fluids and gas. While the tube was in place the patient could not take nourishment by mouth. On January 17th she was given glucose and water intravenously, but there was a net deficit of intake versus output of fluids that day. The patient lost electrolytes (fluids containing nutrients such as sodium chloride and potassium), due to vomiting, voiding of urine, perspiring and the suctioning action of the Levine tube. No steps were taken to replace them.

On the evening of January 17, Dr. Gore gave an order to the nurses to clamp the Levine tube in order to discontinue its suctioning function. He did this for the purpose of determining if the patient's peristaltic action, suspended by the ileus, had revived so that oral hydration and nutrition could be resumed. On the morning of January 18th the bottle or bag into which material suctioned by the Levine tube was emitted was found by nursing personnel to contain materials suctioned during the night, evidencing noncompliance with Dr. Gore's order to clamp the tube. This fact was reflected in the nurses notes. Dr. Gore testified that he probably did not read the nurses' notes on the morning of the 18th. Assuming that his order to clamp the tube had been carried out, he removed the tube and ordered that the patient be hydrated orally. He testified that if he had known the tube had not been clamped, as ordered, it might have indicated to him that the ileus was still preventing normal absorption of fluids and electrolytes and that hydration of the patient orally was not feasible, requiring intravenous input instead.

On January 18th, after removal of the tube and attempted oral hydration, the patient again had a net fluid deficit with no administration of electrolytes. No tests were undertaken to determine her electrolyte level. Dr. Alan Silverman, expert in the field of internal medicine, testified that failure to administer electrolytes and make tests was, under the circumstances, contrary to basic and routine medical practices taught in medical school, and was an extreme departure from the standard of practice of medicine.

Mrs. D'Abusco died in the early morning of January.19th. Dr. Alex Gerber, specializing in surgery, testified that Mrs. D'Abusco had been losing electrolytes of salt solution, potassium and sodium chloride during the period January 16 to 19th without any replacement. He gave his opinion that because of insufficient fluid intake she went into shock and the combination of inadequate fluids plus imbalance of electrolytes probably caused terminal cardiac arrhythmia and cardiac arrest. He was of the opinion that, under the circumstances, it was grossly improper for Dr. Gore to fail to read X-rays taken the night before she died. He testified that he considered Dr. Gore's treatment of Mrs. D'Abusco to be an extreme departure from the standard of practice of medicine.

Existence of substantial evidence to support the judgment of the superior court is clear from the foregoing.[3]

Petitioner's contention in his briefs that the testimony of Dr. Gerber is not credible because of alleged bias is not properly addressed to this court, there being no suggestion that the testimony was inherently improbable or impossible of belief. (*De Arellanes* v. *Arellanes* (1907) 151 Cal. 443, 448 [90 P. 1059]; *Ideal Packing Co.* v. *Brice* (1955) 132 Cal. App.2d 582, 585 [282 P.2d 957].)

 *The Definition of Gross Negligence Applied by Respondent Board and Accepted by the Superior Court Is Proper*

Section 2361 of the Business and Professions Code provides that "The Division of Medical Quality shall take action against any holder of a certificate [to practice medicine] who is guilty of unprofessional

---

[3]Opinion evidence was received that petitioner's conduct either was not negligent or did not involve the element of grossness required by section 2361 of the Business and Professions Code as a basis for suspension of petitioner's license. However, on this appeal every substantial conflict in the evidence is to be resolved in favor of the judgment. (6 Witkin, Cal. Procedure (2d ed. 1971) pp. 4236-4247.)

conduct which has been brought to its attention....[¶] Unprofessional conduct includes but is not limited to the following:...(a)...(b) Gross negligence...."

The term "gross negligence" is not expressly defined in the Business and Professions Code and its meaning in section 2361 has not been adjudicated by our appellate courts. However, section 2900 et seq. of the Business and Professions Code authorize regulation by respondent board of professional psychologists. Section 2960 authorizes the board to suspend or revoke the license of a psychologist on the ground, among others, of "being grossly negligent in the practice of his profession."

In *Cooper v. Board of Medical Examiners* (1975) 49 Cal.App.3d 931 [123 Cal.Rptr. 563], the court was called upon to determine the meaning of the words "grossly negligent" in section 2960 as applicable to the conduct of a psychologist whose license had been revoked. After holding that substantial evidence supported the trial court's findings, the court said (p. 941): "Section 2960, subdivision (i), provides that a psychologist's license may be revoked if he is 'grossly negligent in the practice of his profession.' The California Supreme Court in *Van Meter v. Bent Construction Co.* (1956) 46 Cal.2d 588, 594 [297 P.2d 644], defined 'gross negligence' as 'the want of even scant care or an extreme departure from the ordinary standard of conduct.'[4] [¶] Dr. Mervin Freedman, whose qualifications were not challenged by appellant, testified that conduct such as that described in findings 3 and 5 constituted an 'extreme departure from the standard of practice of psychology.'"

As shown above, two of the medical expert witnesses in the instant case, Drs. Gerber and Silverman, testified that Dr. Gore's treatment of his patient was "an extreme departure" from standard medical practice. They were not asked and did not testify as to whether or not that treatment denied the patient "even scant care." Petitioner contends that failure to cover that aspect of the *Van Meter* definition leaves the evidence insufficient to support the findings of gross negligence. We disagree.

---

[4]In *Van Meter v. Bent Construction Co., supra,* it was held that plaintiff, a subcontractor, was not precluded from recovering damages against the general contractor for negligent misrepresentations where the trial court did not determine the plaintiff was either grossly negligent in relying on the defendant's statements or that such reliance was either preposterous or irrational or amounted to neglect of a legal duty. (46 Cal.2d 588, 595.)

The language used by the *Van Meter* court is in the disjunctive, indicating that gross negligence could consist of either want of even scant care *or* extreme departure from the ordinary standard of conduct, but not necessarily both. In *Cooper, supra*, the court's statement that gross negligence had been defined as "the want of even scant care or an extreme departure from the ordinary standard of conduct" is immediately followed by the statement that a medical witness testified that the accused's conduct "constituted an extreme departure from the standard of practice of psychology," without mentioning whether or not it amounted to want of scant care. The implication is that proof of either, but not necessarily both elements, is sufficient.

This conclusion is confirmed by the authorities cited in *Van Meter, supra*, at page 595, in support of that court's definition of gross negligence. In *Kastel* v. *Stieber* (1932) 215 Cal. 37, 47-51 [8 P.2d 474], the court rejected the notion that gross negligence, as that term was used in our automobile guest statute, in effect in October 1929 (Cal. Veh. Act, § 141 3/4), meant some degree of wantonness or willfulness. Indicating its adherence to definition of gross negligence as "a want of slight diligence" (pp. 46-47) the court concluded that, "It must always be borne in mind that a state of facts relating to an automobile accident out on the open highway cannot be controlling as to the conclusions to be reached upon a corresponding state of facts occurring within city limits. The former might only reasonably be held negligence, while in the latter, owing to the difference in the hazardousness of the situation, gross negligence would only be the right conclusion."

Prosser on Torts (1941) page 260, also cited by the *Van Meter* court for its definition of gross negligence, reads as follows: "*Gross Negligence*. This is very great negligence, or the want of even scant care. It has been described as a failure to exercise even that care which a careless person would use. Many courts, dissatisfied with a term so devoid of all real content, have interpreted it as requiring wilful misconduct, or recklessness, or such utter lack of all care as will be evidence of either —sometimes on the ground that this must have been the purpose of the legislature. But most courts have considered that 'gross negligence' falls short of a reckless disregard of consequences, and differs from ordinary negligence only in degree, and not in kind. *So far as it has any accepted meaning, it is merely an extreme departure from the ordinary standard of care.*" (Italics added.)

Read in light of the authorities thus cited by the *Van Meter* court, the definition of gross negligence in *Van Meter* and *Cooper* means a want of even slight care, but not necessarily involving wanton or wilful misconduct; *in other words*, an extreme departure from the ordinary standard of care.[5]

Negligence and gross negligence are relative terms. "The amount of care demanded by the standard of reasonable conduct must be in proportion to the apparent risk. As the danger becomes greater, the actor is required to exercise caution commensurate with it." (Prosser, Law of Torts (4th ed. 1971) at p. 180.)

In the instant case, Mrs. D'Abusco, having a history of impaired health and following major surgery, was wholly dependent on Dr. Gore for adequate postoperative care. Substantial evidence shows that he failed to exercise the standard of care in diagnosis, monitoring and treatment that is basically and routinely taught to students in medical school. Thus, management of his patient was an extreme departure from the standard of medical care, which we hold to be the equivalent of "want of even scant care" under the circumstances of this case.

### The Penalty Imposed by the Board Was Valid

■ Petitioner contends that the more onerous penalty prescribed in the board's second decision denied him due process of law, citing *North Carolina* v. *Pearce* (1969) 395 U.S. 711, 726 [23 L.Ed.2d 656, 670, 89 S.Ct. 2072]. Therein it was held that on resentencing a criminal defendant to a heavier penalty than first imposed, due process requires that justifiable reason be stated and supported by the record, as a precaution against inhibiting the right of appeal.

The instant case is not criminal in nature. Principles of criminal law protecting the right of uninhibited appeal do not apply to civil cases arising out of administrative proceedings. (*Petrucci* v. *Board of Medical Examiners* (1975) 45 Cal.App.3d 83, 88 [117 Cal.Rptr. 735]; *Webster* v. *Board of Dental Examiners* (1941) 17 Cal.2d 534, 537-538 [110 P.2d 992].)

---

[5]In Prosser, Law of Torts, Hornbook Series (4th ed. 1971) page 184, the concluding portion of the quotation from the 1941 edition cited in *Van Meter, supra*, is amended to read: "There is, in short, no generally accepted meaning; but the probability is, when the phrase is used, that it signifies more than ordinary inadvertence or inattention, but less than conscious indifference to consequences; and that it is, *in other words*, merely an extreme departure from the ordinary standard of care." (Italics added.)

In a civil case, granting a new trial sets the whole case at large and gives the trial court authority to try the case anew (*Miller & Lux* v. *Enterprise C. etc. Co.* (1915) 169 Cal. 415, 419 [147 P. 567]; 5 Witkin, Cal. Procedure (2d ed. 1971) § 115, p. 3692), thereby involving the possibility of a result different from that first obtained. In the instant case, petitioner argued to the superior court that the improper conduct of Dr. Warshaw was a denial of due process to the petitioner. The court responded by ordering dismissal of the accusation or, alternatively, a redecision. Petitioner may not now be heard to claim that, having gained the benefit of reconsideration, he can escape the consequences.

The judgment is affirmed.

Kingsley, Acting P. J., and Woods, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 22, 1980.