TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | No. 85-605 |
|  | : |  |
| of | : | <u>MARCH 14, 1986</u> |
|  | : |  |
| JOHN K. VAN DE KAMP | : |  |
| Attorney General | : |  |
|  | : |  |
| RONALD M. WEISKOPF | : |  |
| Deputy Attorney General | : |  |
|  | : |  |

_____


THE HONORABLE JOHN W. WITT, CITY PROSECUTOR, CITY OF SAN DIEGO, has requested an opinion on the following question:

Is a dentist authorized to utilize the following in the course of the practice of dentistry: (1) urinalysis; (2) blood analysis; (3) hair analysis; (4) transcutaneous nerve stimulation; (5) electrogalvanic stimulation; (6) palpation to diagnose problems with the liver, thyroid and adrenal glands, (7) dietary recommendations; (8) prescribing Elavil to relax muscles, or (9) using oral drops to determine vitamin or mineral assimilation.

CONCLUSION

In the course of the practice of dentistry a dentist may utilize urinalyses, blood analyses and hair analyses, transcutaneous nerve stimulation and electro-galvanic stimulation, may offer dietary recommendations, may use oral drops to determine vitamin assimilation, and may prescribe the use of Elavil to relax muscles, if such undertakings are necessary to diagnose or treat a disease of the human teeth, alveolar process, gums,

1

jaws, or associated structures, and if they have been accepted as an effective means thereof by the dental community. A dentist is not authorized to palpate the liver, thyroid or adrenal glands.

ANALYSIS

Section 1627 of the Dental Practice Act (Bus. & Prof. Code, div. 2, ch. 4, § 1600 et seq.) authorizes the practice of "dentistry" in California. Section 1625 defines that practice as follows:

> "Dentistry is the diagnosis or treatment, by surgery or other method, of diseases and lesions and the correction of malpositions of the human teeth, alveolar process, gums, jaws, or associated structures; and such diagnosis or treatment may include all necessary related procedures as well as the use of drugs, anesthetic agents, and physical evaluation. Without limiting the foregoing, a person practices dentistry within the meaning of this chapter who . . .

> ". . . . . . . . . . . . . . . . . . . . .

> "(b) Performs . . . an operation or diagnosis of any kind, or treats diseases or lesions of the human teeth, alveolar process, gums, jaws, or associated structures, or corrects malposed positions thereof.

> ". . . . . . . . . . . . . . . . . . . . ."

We are asked if a dentist may utilize or perform any of the following in the course of that practice: urine, blood, and hair analyses; transcutaneous nerve and electrogalvanic stimulations; palpation to diagnose problems of the liver, the thyroid and the adrenal gland; offer dietary recommendations; prescribing Elavil; utilizing oral drops to determine vitamin and mineral assimilation. The question is asked in part because the undertakings, such as they be, clearly involve the practice of medicine and therefore may not be performed unless one is "authorized to [do so] pursuant to a certificate obtained in accordance with some . . . provision of law. . . ." (§ 2052; cf. § 2061.)[1] We must

---

[1] Section 2052 of the Medical Practice Act (Bus. & Prof. Code, div. 2, ch. 5, § 2000 et seq.) provides:

> "Any person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other

therefore examine the Dental Practice Act to determine whether it authorizes a dentist to perform the procedures in question. (57 Ops.Cal.Atty.Gen. 341 (1974) (dentists performing acupuncture); cf. 66 Ops.Cal.Atty.Gen. 428, 430 (1983) (authority of RN to inject a contrast agent for a diagnostic study); 64 Ops.Cal.Atty.Gen. 240, 243-244 (1982) (authority of RN to prescribe, administer or furnish drugs).)

Section 1625 in conjunction with section 1627 of the Dental Practice Act authorizes a licensed dentist to--

1.  diagnose or treat,

2.  by surgery or other method,

3.  diseases and lesions (and correct malpositions),

4.  of the human teeth, alveolar process (i.e., the socket within the jawbone in which the root(s) of a tooth are set), gums, jaws, or associated structures,

and 5.  such diagnosis or treatment, may include all necessary related procedures, as well as the use of drugs, anesthetics and physical evaluation. (§ 1625.)

The scope of dental practice so defined is not open ended. The broad definitional authority found in the first, second, third and fifth components -- that to diagnose and treat by surgery or other method (and to perform an operation of any kind (subd. (b)), utilizing all necessary related procedures including physical evaluation, is limited by the fourth component to correcting diseases and lesions *of* the human teeth, alveolar process, jaws and associated structures. Thus any diagnostic or treatment endeavor a dentist would undertake must be related and directed thereto. (Cf. 57 Ops.Cal.Atty.Gen. 341, 343 ("that facial area"). In other words, section 1625 literally focuses on particular localities and any authority it provides is circumscribed accordingly. (Cf. 66

---

physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter, or without being authorized to perform such act pursuant to a certificate obtained in accordance with some other provision of law, is guilty of a misdemeanor."

The inquired procedures constitute the practice of medicine because they involve the diagnosis or treatment of physical conditions.

Section 2061 of the Medical Practice Act echoes the last part of section 2052, thus:

"Nothing in this chapter shall be construed as limiting the practice of other persons license, certified, or registered under any other provision of law relating to the healing arts when such person is engaged in his or her authorized and licensed practice."

3

Ops.Cal.Atty.Gen. 302, 308-309 (1983) (defined authority of psychologists is limited to mental, as opposed to physical conditions).)

Such observation however may be only stating the obvious and further explanation is required. That is because the phrase "diseases and lesions . . . of the human teeth, alveolar process, gums, jaws, or associated structures" is elusive. A "disease" we know is an impairment of the normal state that interrupts or modifies the performance of the body's functions, systems or organs (Webster's *Third New Internat. Dict.* (1971 ed.) at 648), while a "lesion" is "an abnormal change in structure of an organ or part due to injury or disease." (*Id.*, at 1296.) (Accord, Stedman's Medical Dict. (5th Lawyer's Ed. 1982) at 403 & 776.) But that does not help much to define the authorized scope of dental practice.

Section 1625 provides that a dentist may diagnose and treat diseases and lesions *of* certain structures mentioned therein, a formulated definition of the scope of the practice that has existed since the progenitor of the current Dental Practice Act was enacted in 1915. (Stats. 1915, ch. 426, § 11, p. 705 ("diseases or lesions *of* the human teeth or jaw").) The problem is that there are certain dysfunctions of those structures that are specifically diseases *of* them in that they specifically occur or manifest themselves there both with respect to the cause of the problem (i.e., its etiology), and the abnormal physical condition presented (i.e., its pathology and symptomology). (E.g., dental caries and malocclusions, the two most common dental abnormalities (Guyton, *Textbook of Medical Physiology* (5th ed. 1976) at 1070), pyorrhea (cf. *Whetstone* v. *Bd. of Dental Examiners* (1927) 87 Cal.App. 156, 158, 162-164), myofascial pain-dysfunction, abcesses, and sometimes temporomandibular osteoarthritis). A dentist may certainly diagnose and treat such diseases or lesions. Those problems are particularly localized and section 1625 clearly authorizes a dentist to address them. However, other abnormalities of the structures mentioned in section 1625 are but degenerative changes *in* those structures that have been brought about by a systemic dysfunction elsewhere in the body. (E.g., scurvy (see, e.g., Davidson, *The Principles and Practice of Medicine* (7th ed. 1964) at 474-480; Guyton, *supra*, at 983; *Medical Reference Library, Symptoms & Illnesses* (Time, 1983) at 256-257; Wyngaarden & Smith ed. *Cecil Textbook of Medicine* (16th ed. 1982) at 1370-1372), AIDS, pregnancy, etc. See generally *Burket's Oral Medicine* (7th (Lynch) ed. 1977), ch. 33, pp. 651-661.) What is the dentist's authorized role in such cases? In other words, may a dentist proceed to diagnose and treat the root cause of a problem with a section 1625-structure when such is elsewhere in the body?

The answer is not easily articulated and a hard and fast rule cannot be set because there are innumerable possibilities of systemic dysfunction which can have some effect on a structure mentioned in section 1625. Generally speaking though, we believe that where a systemic problem is such that it is particularly apt to localize itself in one of

4

those oral-structures, it is within the defined province of dentistry to diagnose and treat it. (Cf. 16 Cal. Admin. Code, § 1033.) On the other hand, where the organic disturbance is such that its effect on the 1625-structure is merely incidental to something greater occurring elsewhere in the body, we do not believe a dentist is authorized to undertake its diagnosis or treatment. Rather, "if such organic disturbance be suspected . . . the proper course of action would be for the [dentist] to refer the patient to a physician . . . who can order and tailor such diagnostic tests as are necessary to discern it and who has the wherewithal to interpret the results, to diagnose the problem and to plan a course of treatment accordingly." (66 Ops.Cal.Atty.Gen., *supra*, at 309, fn. 10 (licensed psychologists suspecting that an organic imbalance may be the cause of a mental, emotional or psychological distress).) In other words, the dentist's role -- which is not at all minimal in overall patient care -- would be to recognize the possibility of a greater systemic problem from the oral pathology and to make an appropriate medical referral. In connection therewith, any treatment a dentist would provide would be specifically directed and localized to the manifestation of the problem in the structure mentioned in section 1625 rather than being directed to the underlying etiology itself. To posit otherwise pits the dentist between the Scylla of treating but the oral part of an overall problem while ignoring the rest and the Charybdis of addressing the rest, even indirectly, and thus "operating" on structures other than those upon which he or she is authorized to work. (§ 1625, § 1625, subd. (b); cf. *Jacobs* v. *Board of Dental Examiners* (1922) 189 Cal. 709, 714 ("operate").)

With this in mind we can answer the specifics of the question asked. However, our answer must still be general because we are not healing arts professionals with sufficient expertise as to the efficacy of the procedures involved (indeed some are very novel) and because we are not specifically told with sufficient exactitude the condition(s) a dentist would address by their application.

We can begin with examples of the two extremes posed by items #6 (palpation of the liver, thyroid and adrenal gland) and #8 (prescribing Elavil to relax muscles). Palpation is the physical examination with the hands of an area, organ or structure to discern an abnormality with it. The method involves the use of fingertips for touch, the metacarpophalangeal area of the palms for vibration, and the dorsal aspect of the hand for temperature. (Rose & Kaye, *Internal Medicine For Dentistry* (St. Louis: The C. V. Mosby Co., 1983) at p. 7.) Using palpation to diagnose a problem with the liver, adrenal gland or thyroid would not be within the authorized practice of dentistry as we have viewed it because it is not likely that a dysfunction of those organs would affect a dental structure specifically but rather would produce a systemic disturbance with serious effects elsewhere if not throughout the body. Given that, any diagnosis to be made as to the status of those organs -- even should an abnormality with them be the cause of a defect in a section 1625 structure -- would be a medical determination for a

5

physician to make and not one to be made by a dentist. Should such an abnormality be suspected, it would behoove a dentist to refer the patient to a physician so it could be determined. (Cf. 66 Ops.Cal.Atty.Gen., *supra*, at 309, fn. 10.) A dentist might "treat" the symptoms that have particularly manifested themselves in the teeth, alveolar process, jaws, gums, or associated structures, but such treatment would have to be specifically directed to them. A dentist would not be authorized to address or treat the problem of the underlying etiology itself.

With respect to the prescribing of Elavil (item #8), dentists are specifically authorized by section 1625 to use drugs in the course of their treatment of "diseases of the mouth." (Cf. Bus. & Prof. Code, §§ 4036, 4213, 4227, 4228; Health & Saf. Code, §§ 11026, 11150, 11210.) To the extent that Elavil (amitriptyline HCl), a trycyclic antidepressant with sedative effects (see Physician's Desk Reference (1984 ed.) pp. 1278-1280), or any other drug would be useful in that endeavor whether to produce local or general insensibility to pain, to relax a patient, or to combat a localized infection (e.g., gingivitis), its use by a dentist is specifically authorized. (Cf. 57 Ops.Cal. Atty.Gen. 341, 343, *supra*, citing *Painless Parker* v. *Board of Dental Examiners* (1932) 216 Cal. 285, 295.)

The same would be said for urinalysis (#1) and blood analysis (#2), and perhaps for hair analysis (#3) and the use of oral drops to determine vitamin and mineral assimilation (cf. "applied Kinesiology") (#9). Urinalysis and blood analysis are useful and well established diagnostic tools to ascertain how well or poorly various bodily systems are performing. They also are used to disclose the presence of infection. We are told that the other two procedures also serve a diagnostic purpose: hair analysis and the placing of oral drops of a particular nutrient on an area of skin followed by observing musculature contraction, would be used to determine vitamin and mineral deficiencies and the general nutritional status of a dental patient. The value of these as diagnostic tools, however, has not been generally accepted. Nevertheless, to the extent that either of them or the first two diagnostic tests could efficaciously be used to help diagnose an abnormality specifically localized in a structure mentioned in section 1625, its being used would be an authorized component of a dentist's diagnostic armamentarium. However, the use of any such test to diagnose a systemic disturbance that has but incidentally manifested itself in such a structure would exceed a dentist's authority.

The same dichotomy would apply to a dentist giving nutritional advice (#7). While section 2068 of the Medical Practice Act specifically provides that its strictures should not be construed to prohibit any person from "providing nutritional advice or giving advice concerning proper nutrition," the section also declares that no authority is conferred thereby "to practice medicine . . . or to undertake the prevention, treatment, or cure of disease . . . or to state that any product might cure any disease . . . or

6

condition in violation of any provision of law."  Nevertheless, the Legislature has clearly recognized that health practitioners can provide nutritional advice in the course of their practice.  (§ 2068.)[2]  Surely the giving of the same is an integral part of good dentistry for it is all well established that the eating of certain foods can be harmful to one's dental health and the lack in one's diet of certain foods with their vitamin and mineral content can be just as deleterious.  (See, e.g., Guyton, *Textbook of Medical Physiology*, *supra*, at 970-986; J. Katz, "Nutritional Disorders," *Internal Medicine for Dentistry*, *supra*, at pp. 1102-1113.)  A dentist would be authorized by section 1625 to offer nutritional advice incident to treating problems with the structures mentioned therein that have been caused by improper nutrition but again, if serious nutritional disturbances which affect other parts of the body are suspected, referral to a physician should be made.

We understand transcutaneous nerve stimulation (#4) and electrogalvanic stimulation (#5) to be variations on acupuncture -- a method of controlling pain that is now respected and generally accepted within the medical community.  (See, e.g., Bus. & Prof. Code § 2075; cf. 57 Ops.Cal.Atty.Gen. 340, 341, *supra*.)  In 57 Ops.Cal.Atty.Gen. 340 we were asked whether a dentist could use acupuncture in the course of his practice. We concluded that one could: Although acupuncture was then a novel treatment or mode of pain control and although it was not taught as part of any study at an accredited California dental school, we saw no legal objection to its being used in licensed dental practice.  (*Id.*, at 343.)  The Legislature, we said, "intended to give the dentist broad discretion in his selection of an appropriate method of treatment for an affliction of that facial area described in section 1625" (*ibid.*) and "the administration of some mode of anesthetic for the production of local or general insensibility to pain had long been a part of the practice of dentistry."  (*Ibid.*) Thus we concluded that acupuncture -- for the direct treatment of an affliction or to control pain in assistance to such -- came within the definition of dentistry as a licensed dentist is authorized to practice pursuant to section 1625 of the Dental Practice Act and accordingly that dentists could use it "as long as it

---

[2] Section 2068 requires persons in the commercial practice of providing nutritional advice to post the following statement in an easily visible and prominent place in his or her place of practice:

"NOTICE

"State law allows any person to provide nutritional advice or give advice concerning proper nutrition--which is the giving of advice as to the role of food and food ingredients, including dietary supplements.  This state law does NOT confer authority to practice medicine or to undertake the diagnosis, prevention, treatment, or cure of any disease, pain, deformity, injury, or physical or mental condition and specifically does not authorize any person other than one who is a licensed health practitioner to state that any product might cure any disease, disorder, or condition."

7

relates to their special area of authorized practice." (*Id.*, at 341.)[3]  We follow suit today and conclude herein that a dentist may employ subcutaneous nerve stimulation and electrogalvanic stimulation as part of the treatment of a disease or lesion of the teeth, gums, jaw or alveolar process, or corrections of malpositions thereof.

We have answered the question of whether a dentist might undertake various endeavors in the course of his or her practice in general terms upon our perception of the practice of dentistry that is defined in section 1625.  Two other aspects of the Dental Practice Act must be considered.

Section 1670 provides that a dentist may have his license revoked or suspended by the Board of Dental Examiners for "unprofessional conduct, or incompetence, or gross negligence, or repeated acts of negligence in his or her profession . . . ."  In such context, the term "gross negligence" has been defined to be *either* the want of even scant care *or* an extreme departure from the ordinary standard of professional practice.  (*Yellin* v. *Board of Medical Quality Assurance* (1985) 174 Cal.App.3d 1040, 1058-1059; *Gore* v. *Board of Medical Quality Assurance* (1980) 110 Cal.App.3d 184, 198 ("an extreme departure from the standard of medical care"); accord, *Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 138; *Mulligan* v. *Hearing Aid Dispensers Examining Com.* (1983) 142 Cal.App.3d 1002, 1006 ("generally accepted practices and procedures within the professional community").)

Again, we have no expertise to determine the efficacy of the procedures involved.  Nor is it for us to determine whether their use, in particular situations or at all, would extremely depart from standard professional practice.  Rather that is a determination for the Board of Dental Examiners to make upon expert testimony as to such. (*Gore* v. *Board of Medical Quality Assurance*, *supra*, 110 Cal.App.3d at 196; *Thole* v. *Structural Pest Control Bd.* (1974) 42 Cal.App.3d 732, 738; cf. *Contreras* v. *St. Luke's Hospital* (1978) 78 Cal.App.3d 919, 927.)  But should it be shown that an extreme departure from the accepted practices and procedures within the dental community has taken place, the offending dentist could be appropriately disciplined. (See also § 1705.5: on an application by ten dentists, the superior court may issue an injunction restraining a dentist from violating the Dental Practice Act.)

---

[3] The fact that acupuncture was not taught as part of any study at an accredited California Dental School was an irrelevancy in determining whether it fell within the scope of authorized practice because the scope of that authorized practice is not predicated on the discipline's curriculum but rather upon the statutory definitions. (*Id.*, at 341, 343.)

Another possibility along these lines exists. Section 1680, subdivision (p) of the Dental Practice Act defines "unprofessional conduct" upon which the board may discipline a licentiate to include:

> "[t]he clearly excessive prescribing or administering of drugs or treatment, or the clearly excessive use of diagnostic procedures, or the clearly excessive use of diagnostic or treatment facilities, as determined by the customary practice and standards of the dental profession"

It also provides that a violation of that subdivision constitutes a misdemeanor.

Once again, we are not versed in the intricacies of the procedures which are inquired of herein and we are not given sufficient specifics as to their intended use and connection with the practice of dentistry. At least four of the procedures are novel and their being used at all has been seriously questioned. Should it be shown in the appropriate forum that any of those procedures, or indeed any of the other five, is of no value in the proper practice of dentistry, the Board of Dental Examiners would be authorized to institute disciplinary action against a dentist who consistently utilized it (§§ 1670, 1680(p); cf. § 1670, repeated acts of negligence) and a public prosecutor would also be justified in instituting criminal proceedings against him or her. (§ 1680, subd. (p).)

We therefore conclude that in the course of the practice of dentistry a dentist may seek a urinalysis, blood analysis, and hair analysis, may use oral drops to determine vitamin assimilation, may prescribe Elavil to relax muscles, may offer dietary recommendations, and may use transcutaneous nerve stimulation or electrogalvanic stimulation to control pain, where such endeavors could effectively be used to diagnose or treat a disease of the teeth, gums, jaw, alveolar process or associated structures. A dentist may not palpate the liver, the thyroid or the adrenal gland to discern problems therewith.

*****

9