[L.A. No. 31314. Apr. 8, 1982.]

JOSEPH WALTER FRANZ, Plaintiff and Appellant, v.
BOARD OF MEDICAL QUALITY ASSURANCE, Defendant and
Respondent.

COUNSEL

Fidler, Bell & Dyer, Morgan & Miceli, Victor L. Miceli, Selvin & Weiner and Paul Selvin for Plaintiff and Appellant.

George Deukmejian, Attorney General, and M. Gayler Askren, Deputy Attorney General, for Defendant and Respondent.

OPINION

NEWMAN, J.—Joseph Franz appeals from a judgment denying a writ of mandate against the Board of Medical Quality Assurance (Board). The Board, acting through its Division of Medical Quality, suspended his physician-and-surgeon license for one year and placed him on ten years' probation[1] after finding him guilty of gross negligence, dishon-

---

[1]The Board ordered that he pass an examination in gastrointestinal diseases before resuming practice. During the probationary period he was to refrain from performing or assisting surgery, admitting surgical patients, holding an ownership interest in a hospital, or practicing obstetrics or gynecology, except for pelvic exams proper for a general practitioner. He was required annually to take postgraduate courses and to keep the Board advised if he changed address or left the state to reside or practice. The

esty, and falsifying a medical document. (Bus. & Prof. Code, §§ 2234, subds. (b), (e), 2261, former §§ 2361, subds. (b), (e), 2411.)[2] Since three of the findings of gross negligence are not supported by the record we direct that the penalty be reconsidered.

In January 1974 Wayne Wollweber consulted Dr. Franz, a general practitioner, because of abdominal pain. He had a 25-year history of recurrent peptic ulcer with episodes of perforation. In April 1974 Franz referred Wollweber to a surgeon, Dr. Tiffany, who performed surgery at Tustin Community Hospital (Tustin) with Franz' assistance. After the operation Wollweber developed pneumonia. In July 1974 Franz himself performed a hemorrhoidectomy on Wollweber at Tustin; the patient again had postsurgical lung problems. There was testimony that the two operations with their complications made him a high risk for further surgery.

He complained of increasing abdominal pain. In October 1974, after examining X-ray reports and a gastric-juice analysis done at Tustin, Franz concluded that exploratory surgery was necessary. He suggested Anaheim Doctors' Hospital (Anaheim)—a private, 24-bed institution where he had staff privileges. Unlike Tustin and Good Samaritan, another nearby hospital, Anaheim had no intensive care unit (ICU) or respirator.

Franz scheduled the surgery for October 7 and expected complications. He asked one of the owners of Anaheim, Dr. Olivet, whom Franz believed to be chief of surgery there, to recommend a surgeon. Olivet

---

suspension and probationary period would be tolled during any period of practice outside California.

Pending final determination of this appeal a trial-court stay of the one-year suspension has been extended. The probationary conditions remain in effect, except that he may admit patients for surgery in emergencies.

[2] Section 2234 (see former § 2361) reads in pertinent part: "The Division of Medical Quality shall take action against any licensee who is charged with unprofessional conduct. In addition to other provisions of this article, unprofessional conduct includes, but is not limited to, the following:

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(b) Gross negligence.

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(c) The commission of any act involving dishonesty or corruption which is substantially related to the qualifications, functions, or duties of a physician and surgeon...."

Section 2261 (see former § 2411) reads: "Knowingly making or signing any certificate or other document directly or indirectly related to the practice of medicine or podiatry which falsely represents the existence or nonexistence of a state of facts, constitutes unprofessional conduct."

suggested Dr. Ali, who was board-certified. On October 6, after admission to the hospital, Wollweber signed a consent form that listed Olivet and Franz, but not Ali, as his surgeons.

On October 7, just before the operation, Franz and Ali conferred for the first time. Franz showed Ali the results of the preoperative X-rays and tests Franz had ordered. Ali then performed a subtotal gastrectomy, Franz assisting. A portion of the stomach was removed, and a new opening was created from the top of the stomach into the middle of the small intestine. The duodenum was bypassed and sewn shut. Ali used absorbable sutures. Franz doubted that was correct procedure but said nothing. No acid-secreting glands were removed.

Ali and Franz jointly assumed responsibility for Wollweber's care in the week after the operation. Though each of them entered progress notes and orders on Wollweber's medical chart, they did not communicate with each other. Franz questioned the wisdom of several of Ali's orders but neither countermanded them nor discussed them with Ali.

On October 8 the patient was restless and in pain; and there was fresh blood on his dressing and around the surgical drain, an indication of internal bleeding. On October 9 and 10 he had a "spiking" fever that varied from 99 to 103 degrees. Though the spikes were not ascending, those symptoms could indicate sepsis—a serious, continuing, blood infection. His pulse and blood pressure also fluctuated markedly, and four units of whole blood were administered. Yet Franz' chart-notes at one point indicated that the patient was stable.

On October 11 Franz saw symptoms of pneumonia. He also suspected pulmonary embolism and ordered laboratory tests. Apparently the orders were not countersigned by the floor nurse and executed until the evening of October 12.

Meanwhile, on either October 11 or 12, Franz asked Dr. Fernandez, an internist on the staff, for a consultation. Fernandez did not examine Wollweber until the evening of October 12. He noticed tachypnea—rapid, difficult breathing—and an elevated pulse rate. He too suspected pulmonary embolism and considered the more-remote possibility of a ruptured stomach. He ordered tests that were completed shortly after 11 p.m. on the 12th. The results, including abnormal phosphate and bilirubin levels, were further indicators of embolism or perforation. Franz

testified he discussed the patient's condition with Fernandez by telephone that evening. Fernandez testified that Franz was not available by telephone.

On the morning of the 13th Fernandez became alarmed by Wollweber's deteriorating condition. The timing of events that followed is unclear. Olivet's testimony placed many of them in the predawn hours; other witnesses, including Franz, testified to a later time-frame. Fernandez telephoned Olivet and asked him to attend the patient. When Olivet arrived he noticed the patient was stuporous and had a distended abdomen. At some point Franz arrived. X-rays were taken. The patient began to complain of left-shoulder pain, a symptom characteristic of rupture of the sutured duodenal stem (a "duodenal stump blowout"). X-rays confirmed that catastrophic diagnosis.

Olivet telephoned Ali, but (despite pleas of urgency) whoever answered Ali's phone said he was not available. Franz finally reached Ali, who said there was nothing to worry about and he would see the patient later. Franz and Olivet took this to mean Ali had abandoned the patient. Olivet and other personnel then tried to obtain another surgeon for emergency repair-surgery. All those contacted declined to intervene.

Believing Wollweber was in extremis and could not be moved, Olivet decided to do the surgery himself—though he was not a surgeon, had never repaired a duodenal stump blowout, knew the operation would require great skill, and felt unqualified. The mortality rate for surgery of this kind is 80 percent. Franz did not object when Olivet decided to operate, and Franz assisted.

The postoperative report notes that the stump of the duodenum, sutured by Ali on October 7, had ripped open, spilling stomach contents into the peritoneum. Olivet resutured the stump but apparently made no thorough effort to drain and sterilize the peritoneal cavity.

Olivet and Franz participated in Wollweber's post-operative care along with Fernandez. The patient's condition continued to deteriorate. Fernandez concluded on October 14 that Wollweber was critically ill and in danger of respiratory failure. He decided that more thorough care was needed and transferred Wollweber to Good Samaritan on his own responsibility.

Wollweber was connected to a respirator on October 15, the day Franz left on his vacation. There was new internal bleeding. On October 19 Dr. Shirokov, a surgeon at Good Samaritan, decided the patient would die without a third operation. Shirokov's surgery revealed that Olivet's emergency repair had split open. Wollweber remained on a respirator; but on October 22 a power failure occurred at Good Samaritan, during which the respirator did not function. Wollweber went into cardiac arrest and died at 10:50 a.m. There was testimony that the respirator failure was not a significant cause of death.

## CHARGES AND FINDINGS

At the outset, the Board accused Franz of gross negligence and incompetence on two theories. First, it charged, he was liable for retaining Ali, an unskilled surgeon, then failing to intervene when Ali committed extreme violations of surgical and treatment standards. The charges based on failure to intervene were stricken later.

Second, the accusation asserted, Franz himself rendered grossly deficient treatment by making chart entries that were misleading and too optimistic, allowing food by mouth, ignoring symptoms of the blowout, ordering a barium test dangerous in the circumstances, and failing to obtain a competent surgeon when Ali abandoned the patient.

The Board also charged Franz with dishonesty and falsifying medical documents. It alleged that Franz had engaged in the practice of "ghost surgery" by concealing the identity of the surgeon in the consent form and in conversations with the patient; also, that Franz misrepresented the seriousness and risks of the operation and that entries on the postoperative chart were dishonest.

The matter was heard in October 1977 and February 1978 before a panel of Medical Quality Review Committee No. 13. Two of the three members were physicians, and an administrative law judge presided. The seven-member Division of Medical Quality (Division)[3] adopted the

---

[3]A Medical Quality Review Committee (Committee) works under the jurisdiction of the Division, that arm of the Board charged with disciplinary matters. (Bus. & Prof. Code, §§ 2003-2004, 2320.) The Division finally decides any case in which a local committee panel has imposed license revocation, a suspension exceeding 30 days, or practice restrictions exceeding one year. (Id., § 2335, subds. (b), (c); see Gov. Code, § 11517.) The Division includes seven of the Board's nineteen members. Only four members of the Division may be licensed practitioners. (Bus. & Prof. Code, §§ 2001, 2008.)

panel's findings that Franz was grossly negligent in (1) choosing Anaheim, since it had no adequate ICU and Wollweber was a high-risk patient, (2) scheduling surgery before obtaining a surgeon, (3) failing to communicate with Ali until the day of the operation notwithstanding actual or constructive knowledge that Ali was unprepared, (4) failing to communicate directly with Ali in the course of postoperative care, (5) failing to consider and note the results of the October 12 tests, and (6) failing to obtain a competent surgeon to repair the blowout after he knew or should have known that Ali had abandoned the patient.

The panel and Division found that Franz was dishonest and had falsified a medical document by intentionally (1) failing to advise that Ali was the surgeon and that Wollweber's consent to his being surgeon was necessary, and (2) misrepresenting the identity of the surgeon on the consent form. Findings were made that, though Ali was grossly negligent in many ways, neither Franz' method of selecting a surgeon nor his choice of Ali was gross negligence. Franz' acceptance of a blind referral through Olivet, however, was deemed "not within the standard of good medical practice." It was also determined that Franz' chart notes did not misrepresent the patient's condition intentionally.

Franz sought mandamus review. Exercising independent judgment on the evidence the trial court approved the findings and the proposed discipline without substantial change.

### SUBSTANTIAL EVIDENCE

Franz attacks several of the court's findings that were patterned on those of the Division. He contends (1) that there is no substantial evidence as to some acts asserted, and (2) that others, even if they did occur, do not prove gross negligence.

The role of appellate courts in administrative mandamus proceedings is well-settled. Even where the trial court must exercise independent judgment on the evidence, its findings are sustained on appeal if supported by substantial evidence on the whole record. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143, fn. 10 [93 Cal.Rptr. 234, 481 P.2d 242]; *Moran* v. *Board of Medical Examiners* (1948) 32 Cal.2d 301, 308 [196 P.2d 20].)

We conclude that, with two exceptions, the record here supports the findings; and we will not burden this opinion with a detailed analysis. The two exceptions, however, are significant.

■ First, we think there is no substantial evidence to support the finding that Franz was grossly negligent in failing to consider and record the October 12 test results. On direct examination Dr. Passaro, a Board witness, did make general statements that some tests ordered were "late and inappropriate" and that it might have been possible to diagnose a rupture before the morning of the 13th. There was also evidence that a blowout was a foreseeable complication, especially in a patient with previous perforated ulcers.

Yet careful questioning by Franz' counsel forced Passaro to retreat from his criticism. He conceded that (1) the specific tests ordered by Fernandez on the 12th, including an abdominal X-ray, were proper, (2) the results available on the 12th were consistent with pulmonary problems, (3) the records through the 12th show no observed symptoms strongly suggesting perforation, (4) a rupture actually may not have occurred until the 13th, and (5) it was reasonable to conclude before then that none had taken place. No witness testified otherwise.

The finding, both administrative and judicial, is only that Franz failed to "consider and make any progress note" of the abnormal October 12 results. That language is puzzling in its technicality. There is no indication he did not "consider" the tests when he arrived at the hospital to assist in the emergency; all evidence is to the contrary. The finding implies a belief that Franz should have been at the hospital, or available for consultation, the moment the test results became known. Apparently all factfinders accepted Fernandez' testimony that Franz could not be reached.

Even thus interpreted the finding is unsupported. There was evidence of pneumonia from the 10th or 11th on. The recurrent fever and bleeding were causes for concern, especially in a patient with a tendency to pulmonary weakness and gastrointestinal perforation. But Wollweber had made normal recoveries from his prior surgeries. And Fernandez testified that, though worried about Wollweber's condition on the evening of the 12th, he saw no immediate threat to life at the time he tried to call Franz. There was no expert testimony that the primary-care physician is expected to be on 24-hour call for a hospital patient with Wollweber's symptoms. There was no evidence that Franz did not respond promptly when an emergency became apparent. He participated fully in consultation and care from the time he arrived at the hospital. We see no basis from which the trial court could conclude that Franz'

response to the October 12 tests was an extreme departure from acceptable medical practice.

■ We reach a parallel result on the finding that Franz was guilty of gross negligence in failing to retain a competent emergency surgeon on the 13th. Franz knew Olivet had made at least three urgent calls to surgeons after the blowout was apparent and Ali had refused to respond. Each surgeon called declined to attend. There was evidence that other hospital personnel also tried to obtain a qualified surgeon. Olivet reported that it looked as if nobody wanted to get involved in a malpractice suit, and they would have to act on their own. He and Franz both testified without contradiction that, when Olivet decided to operate, all present believed the patient would die within an hour or two if the blowout were not repaired; and there was no time for transfer to another hospital. There was no testimony that those conclusions were wrong or unreasonable.

Moreover, Franz had cause not to be acquainted with surgeons who might assist. Testifying for the Board, Shirokov explained, "In Dr. Franz' case, I know many of the details, and I do not believe his action was a departure from acceptable limits. [¶] He was new to the community. He had just started working, as I understand, at Doctor's Hospital of Anaheim. His contact was Dr. Olivet, who was chief of staff and Dr. Franz made no attempt to call any other surgeon. He didn't know any other surgeon...."

Passaro provided the only contrary opinion. In response to a question whether there was "any other negligence" in the record, he said, "Yes. I think this patient became critically ill and they couldn't find anybody to take care of him. [¶] And, finally it wound up that he was operated on by a nonsurgeon as a desperation move." That, though, seems no more than an opinion that *prior* negligence, Franz' included, had caused the patient's condition to deteriorate to a conceded crisis. As we have seen, other Passaro testimony tends to absolve Franz from negligence of that kind.

Finally, the fact of emergency also should absolve Franz from the finding that he was grossly negligent in allowing Olivet, a nonsurgeon, to operate. There was expert testimony that Franz was reasonable in failing to inquire about Olivet's surgical qualifications, since Olivet was titular chief of surgery at Anaheim. More crucially, there was no reason

for Franz to assume that Olivet was less competent to do the surgery than Franz himself. Those were the emergency choices. The finding cannot be sustained.

## GROSS NEGLIGENCE—AGENCY EXPERTISE

The agency and the court found that Franz' choice of Anaheim was gross negligence because Wollweber was a high-risk patient, Anaheim had no adequate ICU, and Franz made the choice—without regard to his patient's needs—in order to obtain surgical privileges he did not have elsewhere. They also ruled that he committed gross negligence by scheduling surgery before selecting the surgeon. He contends that those findings lack substantial evidence because the Board offered no expert testimony that acts of that kind demonstrate "the want of even scant care or an extreme departure from the ordinary standard of conduct," the definition of gross negligence. (*Gore* v. *Board of Medical Quality Assurance* (1980) 110 Cal.App.3d 184, 196 [167 Cal.Rptr. 881]; *Cooper* v. *Board of Medical Examiners* (1975) 49 Cal.App.3d 931, 941 [123 Cal.Rptr. 563]; both quoting *Van Meter* v. *Bent Construction Co.* (1956) 46 Cal.2d 588, 594 [297 P.2d 644].)[4]

The Board answers that any gap in the record was filled by the panel's expertise in medical matters. Because two of the panel's three members were doctors, the Board urges, it could apply special knowledge in assessing gross negligence by a doctor and needed no expert testimony on the pertinent medical standards. Moreover, as we have seen, four of the seven members of the Division that adopted the panel's decision also were doctors. On mandamus review, the Board argues, courts must defer to this off-the-record agency expertise.

The argument lacks merit. California law provides for judicial review of agency decisions to revoke or suspend medical licenses. (See Code Civ. Proc., § 1094.5; *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 69-71 [64 Cal.Rptr. 785, 435 P.2d 553].) Whatever the expertise of certain members of the panel and the Division, we cannot impute similar knowledge to a reviewing judge untrained in medical

---

[4]Throughout the hearing the parties and the panel assumed that, as in medical malpractice cases, Franz' conduct must be measured by local community standards. The community was defined as Orange County; and Passaro and Shirokov, the Board's principal experts, testified on that basis. Though Passaro's practice was limited to Los Angeles County, there appears to be no difference between the two adjacent areas that made him unqualified to express opinions on Orange County standards. (See *Lewis* v. *Johnson* (1939) 12 Cal.2d 558, 561 [86 P.2d 99].)

matters. Yet the trial court is confined to the record of the agency hearing, except in certain cases when evidence was improperly excluded or not previously available with due diligence. (Code Civ. Proc., § 1094.5, subd. (e); *City of Fairfield* v. *Superior Court* (1975) 14 Cal.3d 768, 774-775 [122 Cal.Rptr. 543, 537 P.2d 375].) Therefore the agency record must provide as complete a basis for judicial review as due diligence makes feasible.[5] It must include any technical matter necessary to enable a lay judge to determine whether the agency's decision has adequate support.

To rule that the agency record must be complete enough to allow judicial review of technical questions imposes no unreasonable burden on the administrative process. The Board did introduce "medical standards" testimony as to most of the gross negligence findings in this case, and inclusion of that kind of testimony appears routine in discipline matters. (See, e.g., *Gore* v. *Board of Medical Quality Assurance, supra,* 110 Cal.App.3d 184, 195; *Cooper* v. *Board of Medical Examiners, supra,* 49 Cal.App.3d 931, 941.)

■■ ■■■■ We do not, of course, hold that agency adjudicators may not apply their expert opinions to decide issues of legislative fact. (See 3 Davis, Administrative Law Treatise (2d ed. 1980) § 15.2, p. 138.[6]) A unique efficiency of many agencies is the professional competence they bring to matters delegated to them by the Legislature. We think an agency factfinder may, for example, reject uncontradicted opinion testimony that his own expertise renders unpersuasive. (See

---

[5]The limitation on new evidence contained in subdivision (e) of section 1094.5 may have been a response to *Dare* v. *Board of Medical Examiners* (1943) 21 Cal.2d 790 [136 P.2d 304]. (Cf. Kleps, *Certiorarified Mandamus Reviewed: The Courts and California Administrative Decisions—1949-1959* (1960) 12 Stan.L.Rev. 554, 577-578.) *Dare* held that the trial court, in its de novo review of a medical license revocation, should consider but was not confined to the administrative record. (Pp. 797-799.) But *Dare* cautioned against the practice of presenting only a skeleton case to the agency, reserving the full showing for the mandamus trial. (P. 799.) We therefore decline to find an additional exception to the "no new evidence" rule for cases where the court needs expert testimony though the Board may not. The better practice is to ensure a complete administrative record.

[6]Davis explains the long-recognized distinction between "legislative" and "adjudicative" facts. The latter are "facts concerning immediate parties" and what happened to them; the former are facts "utilized for informing a court's [or agency's] legislative judgment on questions of law and policy." (*Id.,* § 15.1, p. 135.) Community standards of medical practice, and whether particular type of conduct departs grossly from those standards, are "legislative" facts. They inform the agency's judgment about what constitutes a violation of the Medical Practice Act.

*McCarthy* v. *Industrial Commission* (1927) 194 Wis. 198 [215 N.W. 824, 825-826]; 2 Davis, Administrative Law Treatise (1958) § 15.13, pp. 424-425; Cal. Administrative Agency Practice (Cont.Ed.Bar 1970) Hearing Procedure, § 3.34, p. 167.) A fortiori, the same expertise may govern even when the record contains no opinion evidence at all.

Yet due process requires, when in an adjudication an agency intends to rely on members' expertise to resolve legislative-fact issues, that it notify the parties and provide an opportunity for rebuttal. (See, e.g., *Jaffe* v. *State Department of Health* (1949) 135 Conn. 339 [64 A.2d 330, 338, 6 A.L.R.2d 664]; 3 Davis, Administrative Law Treatise (2d ed. 1980) *supra*, § 15:1 et seq., p. 133 et seq.; cf. *In re Ruffalo* (1968) 390 U.S. 544, 550-551 [20 L.Ed.2d 117, 121-122, 88 S.Ct. 1222], rehg. den., 391 U.S. 961 [20 L.Ed.2d 874, 88 S.Ct. 1833].)

The California Administrative Procedure Act requires notice and opportunity to rebut whenever an agency intends to take "official notice ... of any generally accepted technical or scientific matter within the agency's special field, [or] of any fact which may be judicially noticed by the courts of this State." (Gov. Code, § 11515; see Evid. Code, § 450 et seq.)[7]

The agency's notification must be complete and specific enough to give an effective opportunity for rebuttal. It must also help build a record adequate for judicial review. If it meets those requirements we can see no prejudice to the parties.[8]

We cannot accept the premise of *Brennan* v. *State Bd. of Medical Examiners* (1950) 101 Cal.App.2d 193 [225 P.2d 11] that it is improper "for the board to decide ... questions [of violation of professional standards] upon the basis of the opinions held by the several members

---

[7]Section 11515 provides: "In reaching a decision official notice may be taken, either before or after submission of a case for decision, of any generally accepted technical or scientific matter within the agency's special field, and of any fact which may be judicially noticed by the courts of this State. Parties present at the hearing shall be informed of the matters to be noticed, and those matters shall be noted in the record, referred to therein, or appended thereto. Any such party shall be given a reasonable opportunity on request to refute the officially noticed matters by evidence or by written or oral presentation of authority, the manner of such refutation to be determined by the agency."

[8]Arguably the notification should include a brief statement explaining the opinion held by the adjudicative body, the reasons for the opinion, and the members' qualifications to hold it.

of the board," and that "[*n*]*either the board* nor the court could render a just decision except in reliance upon expert testimony." (P. 196, italics added.) As *Brennan* notes, fairness is satisfied when a party "[is] apprised of the evidence against him so that he may have an opportunity to refute, test and explain it, . . ." (*Ibid.*, quoting *English* v. *City of Long Beach* (1950) 35 Cal.2d 155, 159 [217 P.2d 22, 18 A.L.R.2d 547].)

■ Some questions concerning medical negligence require no expertise. Technical knowledge is not requisite to conclude that complications from a simple injection (*Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 790 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717]), a surgical clamp left in the patient's body (*Leonard* v. *Watsonville Community Hosp.* (1956) 47 Cal.2d 509, 515 [305 P.2d 36]), or a shoulder injury from an appendectomy (*Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 488-490 [154 P.2d 687]) indicate negligence. Common sense is enough to make that evaluation. Only where the professional significance of underlying facts seems beyond lay comprehension must the basis for the technical findings be shown and an opportunity for rebuttal given. (Cf. *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 236 [104 Cal.Rptr. 505, 505 P.2d 1].)

We think the record here supports a lay inference that the choice of the Anaheim hospital was grossly negligent. There was ample evidence that Wollweber was a high-risk patient who had suffered pulmonary complications after prior operations. The operation itself was major and serious; and Franz expected complications, including pneumonia. Yet witnesses confirmed that Anaheim had no ICU, cardiac care unit, or respirator. Olivet, its titular chief of surgery, was not a surgeon and did not consider himself a surgery supervisor. The hospital granted surgical privileges on a casual basis, required no formal evidence of competence, and maintained no consistent system of evaluating physicians it allowed to operate on its premises. It had no surgical residents or readily accessible surgical resources.

Thus when Ali refused to attend in Wollweber's crisis Olivet felt compelled to perform emergency surgery himself. After the operation Wollweber continued to show pulmonary weakness, and Fernandez finally found it necessary to transfer him to Good Samaritan. He later explained to Olivet: "[Wollweber needs] a modern type of treatment. This is a respiratory problem of a certain entity, of a certain degree.

With modern medicine and the type of things available in a modern institution—this is only a 24-bed hospital—I feel that this patient is entitled to the best." Olivet in retrospect admitted that Wollweber should have been in a hospital where he could receive intensive care.

When a patient faces risky surgery of a kind that previously has caused him difficulty, common sense requires he be admitted to a hospital that can cope with foreseeable complications. Franz knew the patient's history. His prior use of privileges at Anaheim had exposed him to the conditions there. In any event he had an obligation to be aware of them. It is common knowledge that populous Orange County has many hospitals with modern facilities and qualified staffs. Several are mentioned in the record. No expertise is necessary to conclude that Franz' choice of Anaheim for Wollweber's operation was an extreme departure from the acceptable standard of medical care in that county.[9] Accordingly there was no need for the panel to give notice of its own opinion or allow an opportunity for rebuttal. The trial court could resolve the issue on the record presented.

▮ The same is not true, though, of the court's finding that scheduling surgery before choosing a surgeon was grossly negligent. Passaro did testify that the surgeon is responsible for independent diagnosis and evaluation of the need for an operation. Moreover, the Board's brief on appeal explains why premature scheduling involves the vice of interfering with the surgeon's independent role.

However, Ali apparently was retained the same day as surgery was scheduled or within a day or two afterward. There is no evidence he could not have cancelled the operation had he found it unnecessary after independent examination. There was no expert testimony that Franz' conduct in this instance was an extreme departure from community medical standards. Common knowledge does not supply the link between premature scheduling and independent surgical evaluation. The record does not disclose the basis of either the panel's or the Division's

---

[9]Franz argues there is no evidence he chose Anaheim because he had favorable surgical privileges there. But the record included ample evidence that, as a newcomer to Orange County, he had established privileges only at Tustin and Anaheim and that those at Anaheim were more extensive. Even if he wished to assist in the operation only because of a sense of responsibility to the patient, referral to a physician with admitting privileges at a better-equipped hospital seems to have been the clear professional choice. He admitted at the hearing he wished he had taken that course. Thus, the finding that he placed his hospital privileges above the patient's interest has substantial support.

expert opinion on the issue, and Franz had no opportunity to refute that opinion. Hence the record was inadequate for a trial court finding that the scheduling of surgery before a surgeon was selected constituted gross negligence. The finding cannot be sustained.

## BIAS

Franz argues that he was denied a fair hearing because Dr. Tepper, one of the panel members, was biased against him, a fact that became apparent only during the hearing. This issue was not raised before the agency or the trial court. Appellate courts generally will not consider matters presented for the first time on appeal. (*Bogacki* v. *Board of Supervisors* (1971) 5 Cal.3d 771, 779-780 [97 Cal.Rptr. 657, 489 P.2d 537], cert. den. (1972) 405 U.S. 1030 [31 L.Ed.2d 488, 92 S.Ct. 1301]; *Amluxen* v. *Regents of University of California* (1975) 53 Cal.App.3d 27, 36 [125 Cal.Rptr. 497]; see Cal. Administrative Agency Practice, *supra*, § 3.12, p. 149 [hearing bias should be raised in petition for reconsideration]; but cf. Gov. Code, § 11523 [petition for reconsideration no prerequisite to judicial review].)

Strictly speaking the Board is not prejudiced by Franz' tardiness in claiming bias since that is not a new "theory of trial" on which the Board might have introduced rebuttal evidence before the panel. (Cf. *Bogacki, supra*; see *Ernst* v. *Searle* (1933) 218 Cal. 233, 240 [22 P.2d 715].) Appellate courts often examine trial records for evidence of bias.

Yet to allow the issue to be raised here, when not presented before the trial court, would undermine orderly procedure on administrative mandamus. Section 1094.5 gives that court original jurisdiction to decide whether "there was a fair trial" and the agency "proceeded in the manner required by law." (Subd. (b).) We should not permit questions entrusted by statute to the trial court to be reserved for appeal. We conclude that the issue was waived when Franz failed to raise it below.

## VARIANCE

Franz also argues that the finding of gross negligence for choosing Anaheim hospital varied materially from the charges. It is well settled, however, that variance between pleadings and proof is not a basis for reversal unless it prejudicially misleads a party. A variance

must be disregarded if the issues on which the decision is actually based were fully and fairly tried. (Code Civ. Proc., § 469; *Cooper* v. *Board of Medical Examiners* (1975) 49 Cal.App.3d 931, 942 [123 Cal.Rptr. 563].)

This rule clearly applies here. It was established without contradicton early in the hearing that Wollweber was a high-risk patient who faced probable complications from surgery, but that Anaheim had no ICU, cardiac care unit, or respirator. Franz presented his side of the case after a recess of more than four months. He offered a spirited defense of his choice of hospital. Although he argues his defense would have been different had he been apprised of this issue, he does not explain and we cannot see how that is so.

### Was Franz Disciplined for Ali's Negligence?

Franz urges he was tried for Ali's derelictions. We disagree. The administrative law judge struck all charges that Franz was vicariously liable for Ali's acts in treating Wollweber. The panel rejected the only remaining theory of vicarious liability, Franz' selection of Ali as surgeon. The panel expressly found that the choice of Ali was not gross negligence since "[i]t was not established that [Franz] knew, or should have known, that there was an unreasonable risk that Dr. Ali was grossly incompetent or that there was an unreasonable risk that Dr. Ali would be guilty of grossly negligent acts or omissions as such surgeon." All unprofessional conduct of Franz found by the panel was based on his own acts and omissions in Wollweber's treatment.

Evidence of Ali's conduct could not be severed from the proceedings; though Ali was not a party, the entire course of Wollweber's tragedy involved the intertwined acts of Ali and Franz. The conduct of Ali was necessary to place that of Franz in context. Our review of the record satisfies us that evidence of Ali's negligence was not used unfairly against Franz.

### Counterfindings

Franz asserts he was prejudiced by the trial court's failure to make certain proposed counterfindings. We disagree. All the examples cited in his brief are either unnecessary because subsumed in findings actually made, irrelevant because they do not undermine the judgment, or not established by the evidence.

The rule is that the trial court is presumed to have made all findings necessary to the judgment. Franz fails to show that material findings here were so incomplete, ambiguous, or conflicting as to depart from that rule. (See Code Civ. Proc., § 634.)

## CONCLUSION

■ We have decided that two of the trial court's findings—failure to consider and note test results, and failure to obtain a competent emergency surgeon—did not prove gross negligence under the circumstances. A third determination of gross negligence, based on premature scheduling of surgery, is deficient because the record fails to show the agency's basis for concluding that this conduct was an extreme departure from medical standards. Thus, the finding was subject to neither rebuttal by Franz nor independent mandamus review.

If an agency has imposed a single discipline for multiple charges, some of which are found not sustained by evidence, and if there is "real doubt" whether the same action would have been taken on proper findings, the matter will be returned to the agency for redetermination of penalty. (*Miller* v. *Eisenhower Medical Center* (1980) 27 Cal.3d 614, 635 [166 Cal.Rptr. 826, 614 P.2d 258]; *Bonham* v. *McConnell* (1955) 45 Cal.2d 304, 306 [288 P.2d 502]; *Cooper* v. *State Bd. of Medical Examiners* (1950) 35 Cal.2d 242, 252 [217 P.2d 630, 18 A.L.R.2d 593].)

The findings held improper in this opinion imply serious dereliction of a doctor's duty to his patient. We cannot say they had no influence in setting the discipline. On the other hand, major charges have been sustained and some discipline clearly is warranted. Franz should not practice free of restrictions while the penalty is being reconsidered. The conditions imposed by the stay order therefore should apply in the interim.

The judgment is reversed and the superior court is directed to issue a peremptory writ of mandate requiring the Board to reconsider petitioner Franz' discipline in light of our conclusions. Pending the reconsideration, the stay order restricting petitioner's practice shall remain in effect. The parties shall bear their own costs. (Cal. Rules of Court, rule 26(a).)

Mosk, J., Richardson, J., and Broussard, J., concurred.

**KAUS, J.**—I concur in the result and in the disposition. In doing so I feel bound to state my view that the opinion's discussion of the legislative v. adjudicative fact dichotomy, and of section 11515 of the Government Code, as well as its apparent embrace of Professor Davis' views on the function of judicial notice in administrative proceedings, are unnecessary to the decision.

Were it essential to do so, I would argue at greater length that the effect of taking judicial notice under section 11515 of the Government Code is precisely the same as the effect of such taking under sections 451 and 452 of the Evidence Code. Matter judicially noticed under the Evidence Code must be accepted as a fact. (Evid. Code, § 457.) If a party wishes to offer evidence contrary to the fact noted, he should not be permitted to do so, although the availability of such evidence strongly suggests that the court erred in taking judicial notice in the first place.

There is, however, language in section 11515 of the Government Code which could be interpreted to mean that matter judicially—"officially"—noticed can be contradicted.[1] Section 11515 antedates the Evidence Code by over two decades and was written at a time when there was a division of judicial and scholarly opinion on the issue whether judicially noticed facts could be contradicted. (McCormick, Evidence (2d ed. 1972) § 332, pp. 769-771.) Today the trend, as exemplified by section 457 of our Evidence Code and rule 201(g) of the Federal Rules of Evidence,[2] is unmistakably in favor of conclusiveness of facts judicially noticed. Reconciliation of section 11515 with the Evidence Code is, fortunately, easy enough: if the language concerning an opportunity to refute noticed matter is interpreted as applying before the tribunal makes its final decision on whether to take notice, the two codes are in harmony.

Bird, C. J., concurred.

Appellant's petition for a rehearing was denied May 20, 1982, and the opinion was modified to read as printed above.

---

[1] "Any such party shall be given a reasonable opportunity on request to refute the officially noticed matters . . . ."

[2] "In a civil action or proceeding, the court shall instruct the jury to accept as conclusive any fact judicially noticed. In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed."