[No. B009719. Second Dist., Div. Five. Oct. 22, 1985.]

NAJDAT I. PASHA, Plaintiff and Appellant, v.
BOARD OF MEDICAL QUALITY ASSURANCE,
Defendant and Respondent.

COUNSEL

Herbert E. Selwyn and Jerome B. Rosenthal for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, and William L. Carter, Deputy Attorney General, for Defendant and Respondent.

OPINION

EAGLESON, J.—Najdat Pasha, M.D., appeals from a judgment denying a writ of mandate to compel respondent, Board of Medical Quality Assurance, to vacate a disciplinary order. We affirm.

### FACTS

This case concerns the plastic surgery performed by appellant on two patients, Monique Brisson and Hilda Gicante. At all relevant times, appel-

lant was rendering services as a plastic surgeon for the Frankel Medical Clinic (Clinic) in its Los Angeles and San Diego offices.[1]

In March 1980, Monique Brisson visited the Clinic's Los Angeles office to inquire about cosmetic eyelid surgery.[2] According to Brisson, appellant and the Clinic's beauty consultant suggested that she have cosmetic nose surgery (rhinoplasty). At the time of this initial consultation, Brisson's nose had a low wide bridge with a slight deviation, asymmetrical slightly flaring nostrils, and a notch on the right outer nostril.[3] Appellant told Brisson that he would build up the bridge of her nose with ear cartilage. Brisson thereafter consented to the surgery.

On March 18, 1980, appellant performed the following surgical procedures on Brisson: Implanting a medium-sized silastic (plastic-like) implant over the bridge of the nose to build up the bridge; partial submucous resection to correct the deviation; bilateral resection of the alae (nostril) tissue at the base of the nose to decrease the flaring of the nostrils; and an interior z-plasty to decrease the notch in the right nostril. Afterwards, appellant prescribed antibiotics to prevent infection.

That evening Brisson returned home with her husband, Dr. Bernard Brisson.[4] Appellant phoned Dr. Brisson later that night to inquire about Mrs. Brisson's well-being, and was told she was as "fair" as could be expected.

Over the course of the next several days Brisson's condition worsened. She was bedridden and in considerable pain. Her eyes were swollen almost shut, and they eventually became infected. Dr. and Mrs. Brisson testified that every day for a week after the surgery, Dr. Brisson attempted to phone appellant. Dr. Brisson left several messages at the Clinic and at least one message at appellant's residence. Although the Brissons were home during this entire period, appellant never returned their calls.

On March 25, at a prearranged appointment, appellant removed Brisson's dressings and apologized for not returning her calls. He saw her again on

---

[1]Appellant received his medical degree from the American University in Beirut, Lebanon, in 1955. In 1962, he became board-certified in the United States in both surgery and plastic surgery. After practicing plastic surgery in Beirut for several years, appellant obtained a license in Michigan, and practiced there for one year. Appellant also holds a reciprocity certificate as a physician and surgeon in California, where he began practicing in January 1980.

[2]Brisson, a 26-year-old model and singer, believed that cosmetic surgery would help further her modeling career.

[3]Brisson's nose had previously been fractured in a car accident, and she had twice undergone nose surgery. She relayed this information to appellant during the initial consultation.

[4]Dr. Brisson is a medical doctor, specializing in psychiatry.

March 31 when he prescribed medication for her eye infection. Appellant last saw Brisson on April 7. Throughout this postoperative period, Brisson's nose was swollen, with the right nostril pointing up and the left one closed and pointing down. She was also weak and in considerable pain. On April 16, Brisson was admitted to Brotman Memorial Hospital after she had become feverish and fainted. No firm diagnosis of her condition was made.

A few days after Brisson was released from the hospital, a white substance began protruding from her nose. Brisson immediately consulted with Dr. Steven Hoefflin, a board-certified plastic surgeon. Dr. Hoefflin observed several "deformities" with Brisson's nose: (1) Extrusion of two silastic implants from the right nasal rim and the right intranasal area; (2) stenosis (contraction) of both nostrils and a corresponding difficulty in breathing; (3) a nasal infection; and (4) a one and one-half to two centimeter linear incision on the dorsum (bridge) of the nose which, according to Brisson, was not there before surgery.

In May 1980, Dr. Hoefflin surgically removed several silastic implants and a fibronous cotton-like material from Brisson's nose. Since that time, Dr. Hoefflin has performed several other surgeries on Brisson's nose as part of a multistage reconstruction program.

In April 1980, Hilda Gicante consulted appellant in San Diego concerning cosmetic breast surgery. Gicante subsequently decided to have breast enlargement surgery, a breast lift, and a "tummy tuck."

On April 22, 1980, appellant performed the following surgical procedures on Gicante: Augmentation mammaplasty (breast enlargement), bilateral mastopexy (breast lift), and a lipectomy (removal of excess abdominal skin and fat).

In June 1980, after several postoperative appointments, Gicante told appellant that her left breast had become "hard." Appellant prescribed vitamin E, provided Gicante with a special bra,[5] and told her to return in a few weeks.

On August 14, 1980, Gicante again told appellant about the firmness in her breast. She also complained about her abdominal scar which had become hypertrophied (enlarged). Appellant gave Gicante an injection for the abdominal scar. He also told her to continue taking vitamin E for the breast,

---

[5]Gicante testified that she did not take the vitamin E but that she wore the bra constantly. However, both appellant and the Clinic's nurse (Ardith Levy) testified that they saw Gicante not wearing the bra on several occasions.

and to return in six weeks. According to Gicante, appellant never explained the cause of or treatment for breast firmness.

Shortly thereafter, Gicante consulted two other board-certified plastic surgeons, Drs. Leonard Glass and Wendell Smoot. Both doctors observed that Gicante's breasts were hard, ptotic (drooping), and asymmetrical. Also, her abdomen was irregularly scarred and protuberant. Dr. Smoot subsequently performed a bilateral breast capsulotomy (removal of the tissue around the implants) and replaced both implants to improve softness and symmetry. In a separate operation, he replaced the right implant and revised the abdominal scar. Dr. Smoot believes further surgery is necessary.

PROCEDURAL BACKGROUND

On October 19, 1981, an accusation was filed with respondent charging appellant with gross negligence and incompetence in the treatment of Brisson and Gicante.

An administrative hearing was held over the course of eight days. The hearing officer found appellant's treatment of Brisson to be grossly negligent and/or incompetent in that he: (1) failed to return Brisson's phone calls in the week following surgery; (2) removed excessive amounts of alae tissue at the base of Brisson's nostrils; (3) created a linear scar on the bridge of Brisson's nose; and (4) used a silastic implant instead of the cartilage agreed to by Brisson. Additionally, the hearing officer found three instances of gross negligence and/or incompetence in appellant's treatment of Gicante: (1) Failing to explain the cause of and treatment for breast firmness; (2) incompetently performing the bilateral mastopexies such that the breasts remained ptotic after surgery; and (3) failing to remove a sufficient amount of adipose (fatty) tissue during the lipectomy.[6]

Based on these findings, the hearing officer recommended that appellant's license be revoked, but stayed revocation on certain terms and conditions for a five-year period.[7] Respondent adopted this decision.

Appellant sought mandamus review. Exercising its independent judgment, the trial court found that the findings were supported by the weight of the evidence, and denied the petition.[8]

---

[6]The hearing officer also found that the lipectomy left a "jagged hypertrophied scar" on Gicante's abdomen. It is unclear as to whether this result was also evidence of incompetence.

[7]The conditions of appellant's probation included completing a clinical training program, passing an oral clinical exam, and limiting his practice to activities that are supervised by another board-certified plastic surgeon.

[8]A statement of decision was neither requested nor prepared.

## DISCUSSION

Appellant primarily contends that there is insufficient evidence to support the trial court's decision.

█ The role of the appellate court in an administrative mandamus proceeding is well settled. Where, as here, the trial court must exercise its independent judgment, its decision will be upheld on appeal if supported by substantial evidence in light of the entire record. (*Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 135 [181 Cal.Rptr. 732, 642 P.2d 792].) We conclude that the record supports the trial court's decision.

### A. *Brisson's Surgery*

█ Dr. Hoefflin, who eventually performed surgery on Brisson, gave expert testimony on the standard of appellant's care.[9] His testimony supports the finding that appellant was grossly negligent in failing to return Brisson's phone calls in the week following surgery. Specifically, a physician has an obligation to insure that the patient is properly cared for 24 hours a day. Given the facts as related by Dr. and Mrs. Brisson, it was "an extreme departure from the practice of medicine" not to "return the calls or to assure the patient is properly cared for."

█ Appellant's surgical technique similarly fell below acceptable professional standards. Dr. Hoefflin testified that, overall, appellant's surgery "was one of the worst nasal operations" he had ever seen. He also had 20 "UCLA and world authorities on nasal surgeries" look at Brisson or her photographs. These authorities all agreed that the rhinoplasty was "an extremely poorly performed surgical operation."[10]

Dr. Hoefflin went on to describe three specific problems with the surgery, each of which is reflected in the hearing officer's findings. First, appellant drastically overresected (removed) alae (nostril) tissue, leaving an insuffi-

---

[9]Appellant challenges Dr. Hoefflin's qualifications as an expert witness. This argument is not only raised for the first time on appeal, but is completely without merit. Dr. Hoefflin became a board-certified plastic surgeon after graduating first in his class from UCLA Medical School in 1972. He is chief of plastic surgery at Santa Monica Hospital, chief of plastic surgery at Brotman Memorial Hospital, and assistant clinical professor of plastic surgery at UCLA Medical School. He also monitors the work of senior plastic surgeon residents at several teaching hospitals in the Los Angeles area. Dr. Hoefflin belongs to several professional societies, including the Los Angeles County Ethics Committee. He has a private practice in plastic surgery, and is familiar with the standard of medical practice in the Los Angeles area.

[10]Appellant did not object to the introduction of this hearsay evidence. In an administrative hearing, "[h]earsay evidence may be used for the purpose of supplementing or explaining other evidence . . . ." (Gov. Code, § 11513, subd. (c).)

cient amount of soft tissue to cover the implant.[11] As a direct result of this problem, there was stenosis of the nasal airways and lining, extrusion of silastic implants, and an infection. The "deformity" left by this overresection of tissue is evidence of incompetence.

Second, appellant unnecessarily left a scar on the top of Brisson's nose. Dr. Hoefflin testified that the incision causing the scar must have been accidentally made because: (1) It was not there prior to surgery; (2) there was no reason to make a purposeful incision there; and (3) he has seen this type of scar before where an instrument has accidentally slipped. ■ The scar was further evidence of an "incompetently performed rhinoplasty."[12]

■ Finally, appellant improperly used a silastic implant in the bridge of Brisson's nose. Dr. Hoefflin first noted that, while use of silastic in secondary or tertiary operations is not preferred, it is not evidence of incompetence. However, it is "an extreme departure from the standard of practice" to use a silastic implant when the patient was told that cartilage would be used.

## B. *Gicante's Surgery*

Expert testimony was provided by the two board-certified plastic surgeons, Dr. Glass and Dr. Smoot, who eventually examined Gicante.[13]

---

[11]Dr. Hoefflin based this conclusion on photos taken of Brisson before and after the surgery, his own examination, and the patient's medical history.

[12]Appellant vigorously argues that the hearing officer erred in not finding that a postsurgical blow to Brisson's nose caused the scar. He supports this argument with exhibit D for identification—a one-page, Xerox copy of a letter purportedly written by Dr. Brisson to appellant. The letter states that Brisson suffered a "marked deviation of previously applied nasal implant" when she was struck in the nose by a baby sitting in her lap.

The hearing officer properly sustained respondent's objection to the introduction of the letter into evidence. The letter bore no salutation, date or signature, and was not the complete document. Dr. Brisson recognized his handwriting but could not remember whether the letter was written before or after appellant's surgery.

Furthermore, there was equivocal information as to how the letter came into appellant's possession. Counsel for appellant stated that the letter was "recently discovered" when a copy of it was found in the Clinic's files. Appellant, however, testified that the original had been in the possession of another attorney for quite some time. Clearly, exhibit D for identification was not the "sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs . . . ." (Gov. Code, § 11513, subd. (c).) It was therefore inadmissible.

[13]As with Dr. Hoefflin, appellant attacks the expert qualifications of these two witnesses even though no objection was raised below. Again, the argument is without merit.

Dr. Glass completed a residency in both surgery and plastic surgery after graduating from the University of Maryland Medical School in 1971. He has spent several years in the private practice of plastic surgery. Dr. Glass now is a clinical professor of surgery at the University of California in San Diego and is a visiting professor at Scripps Clinic and Research Foundation. He belongs to the American College of Plastic Surgeons, the American Society of

██ Ample testimony supports the finding that appellant was grossly negligent in treating Gicante's breast firmness. According to both experts, such hardening commonly occurs after mammaplasty surgery because scar tissue forms around the synthetic implant and contracts. When this condition is diagnosed, the standard of practice in Southern California is to explain the nature of the condition and its treatment to the patient. Treatment alternatives including removing the implant, performing a capsulotomy to surgically remove scar tissue, or manipulating the breast externally to crack open the capsule of scar tissue.

Here, Gicante twice complained to appellant about the hardening of her breast. Each time she was told to take vitamin E, to wear a bra, and to return in several weeks. Dr. Glass testified that, under these circumstances, appellant "was guilty of gross incompetence by totally abandoning the patient in the postoperative period at the time when she physically and emotionally desperately needed help." Dr. Smoot likewise concluded that appellant was grossly negligent in this regard. Gicante "had received none of the standard information regarding what could be done" for breast firmness.

The bilateral mastopexy was also incompetently performed. Dr. Glass testified that the purpose of this procedure is to reduce the saggy, pendulous nature of the breasts. Gicante's breasts, however, were much more pendulous than is acceptable after this type of surgery. Dr. Smoot likewise noted that the breasts had only been "minimally lifted," and that they were still unacceptably pendulous. Furthermore, this result cannot be attributed to any failure by Gicante to wear the special bra. According to Dr. Smoot, once scar contracture around the implant begins, wearing the bra will not prevent ptosis.

██ Finally, there is substantial evidence that appellant removed an insufficient amount of tissue during the lipectomy. According to Dr. Glass, appellant's incision was too small to remove the proper amount of excess abdominal skin and fat. Consequently, Gicante was left with a "bunched-up, irregular, pouchy, fatty abdomen" that evidenced "gross incompetence" on the part of appellant. Dr. Smoot concurred in this opinion, stating

---

Aesthetic Plastic Surgery, and the California Society of Plastic Surgeons. He is familiar with the standard of practice in Los Angeles and San Diego.

Dr. Smoot graduated from the University of Utah Medical School in 1970 and completed a four-year residency in general surgery. After later serving as assistant chief of surgery and assistant clinical professor at Crayton University in Nebraska, he completed a two-year residency in plastic surgery at St. Joseph's Hospital in Houston, Texas. In his private practice in San Diego, Dr. Smoot specializes in reconstructive surgery. He is a member of several professional societies including the American Society of Plastic and Reconstructive Surgeons of California. He is familiar with the standard of practice in both San Diego and Los Angeles.

that the incision "did not extend far enough laterally to do what the operation is supposed to do." There were also problems with the way the abdominal skin was pulled down and sutured. Overall, the procedure was incompetently performed.

## DISPOSITION

We have carefully considered the record and all objections raised by appellant, including those not specifically addressed here.[14] These objections are without merit.

The judgment is affirmed.

Ashby, Acting P. J., and Hastings, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 29, 1986.

---

[14]Appellant's remaining arguments—both addressed for the first time on appeal—concern the burden of proof and the definition of "gross negligence." Suffice it to say that no error was committed below in either regard. As to the burden of proof, the hearing officer properly used the "clear and convincing proof to a reasonable certainty" standard. (*Ettinger* v. *Board of Medical Quality Assurance* (1982) 135 Cal.App.3d 853, 856 [185 Cal.Rptr. 601].) The trial court correctly applied the "weight of the evidence" standard. (Code Civ. Proc., § 1094.5, subd. (c).) Similarly, "gross negligence" was correctly defined throughout the hearing as "an extreme departure from the standard of medical care." (*Gore* v. *Board of Medical Quality Assurance* (1980) 110 Cal.App.3d 184, 198 [167 Cal.Rptr. 881].)