[No. B010297. Second Dist., Div. One. Nov. 5, 1986.]

SHERMAN L. KEARL, Plaintiff and Appellant, v.
BOARD OF MEDICAL QUALITY ASSURANCE, Defendant and
Respondent.

**COUNSEL**

Lewin, Lewin & Levin, Mark A. Levin and Henry Lewin for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, and William L. Marcus, Deputy Attorney General, for Defendant and Respondent.

**OPINION**

**SPENCER, P. J.—**

### INTRODUCTION

Petitioner Sherman L. Kearl, M.D., appeals from a judgment denying his petition for a writ of mandate ordering respondent to set aside its decision to suspend petitioner's medical license for one year, the suspension to be stayed during a two-year probation period. This decision was based on respondent's findings petitioner was grossly negligent in his anesthesia of Janet Halverson, in that he failed to record her vital signs at five-minute intervals commencing with the start of anesthesia and he demonstrated incompetence in his anesthesia of Rosa Ortiz, specifically in the anesthetic solution chosen for and the dosage of anesthetic administered to her.

### STATEMENT OF FACTS

Petitioner received his medical degree from California College of Medicine in 1965 and was licensed to practice medicine in California in 1966. He began a residency program in anesthesiology which was interrupted when

he was drafted into the Army. He served as chief of anesthetic and operative services for the military at a hospital in Tokyo; upon completion of his military service, he returned to California where he completed his residency. Since that time, he has practiced anesthesiology in the Los Angeles County area. During that practice, he has worked on over 20,000 cases; approximately one-fourth of those cases involved regional blocks, while the rest involved general anesthesia. He is not board certified in anesthesiology.

## A. *Janet Halverson*

Halverson, a 37-year-old woman, was admitted to White Memorial Hospital on June 5, 1975 with degenerative disc disease. She underwent surgery on June 6, for a laminectomy, discectomy and lumbar fusion; petitioner was the anesthesiologist. During surgery, Halverson's blood pressure and pulse rate dropped; resuscitative measures were taken. Following surgery, Halverson remained unconscious and required an automatic respirator; later tests revealed no brain activity. Halverson died on June 17, 1975, following a cardiac arrest.

Petitioner began administering a general anesthesia at approximately 8 a.m., and surgery began at 8:15 a.m. Petitioner constantly monitored Halverson's vital signs, recording them approximately every 15 minutes until 9:50, when Halverson's blood pressure and pulse rate dropped. Thereafter, petitioner recorded Halverson's vital signs every five minutes.

Dr. Ernest Strauss testified on behalf of respondent. Dr. Strauss received his medical degree in 1958 and completed an anesthesiology residency. Previously licensed to practice medicine in Michigan, he has been licensed and practicing in California since 1970. He has been board certified in anesthesiology since 1965, is a fellow of the American College of Anesthesiologists, member of the Los Angeles County Medical Association and past president of the Long Beach Society of Anesthesiologists. He is a clinical professor of anesthesiology at UCLA and on the staff at UCLA-Harbor Medical Center, where he also teaches. He is familiar with community standards for anesthesiologists as they existed in 1975 and had previously testified in two civil malpractice actions.

Dr. Strauss testified petitioner's failure to take and record Halverson's vital signs every five minutes was an extreme departure from community standards. Since it takes only three to four minutes for irreversible brain damage to occur, vital signs traditionally are taken every five minutes to allow physicians to respond in time to changes in vital signs. The recordation also documents trends in the patient.

Dr. Strauss observed petitioner's anesthesia record reflected nothing out of the ordinary occurred during the first 90 minutes of surgery, and once Halverson's blood pressure dropped petitioner recorded her vital signs every five minutes. Dr. Strauss acknowledged only the failure to *take* vital signs every five minutes is life-threatening.

Petitioner testified on his own behalf. He conceded the common practice in 1975 was to record vital signs every five minutes, but some hospitals provided anesthesia charts with space for recordation at 15 minute intervals. The anesthesia record shows trends in the course of the patient's treatment, but is of marginal value to the anesthesiologist during treatment.

Dr. Benjamin Shwachman also testified on petitioner's behalf. Dr. Shwachman completed an anesthesiology residency following medical school. He has been licensed to practice in California since 1965 and was board certified in anesthesiology in 1971. He was a clinical instructor in anesthesiology at USC for five years.

Dr. Shwachman noted the anesthesia chart on Halverson adequately showed a stable trend for the first 90 minutes of surgery, reflecting nothing untoward, improper or dangerous. He testified it is acceptable to record vital signs every 10 to 15 minutes as long as the anesthesiologist takes the patient's blood pressure more frequently than that and monitors the pulse continuously. He considered petitioner's taking and recording of Halverson's vital signs to be within the standard of care in the community and not grossly negligent.

## B. *Rosa Ortiz*

Ortiz, 31 years old, underwent an elective caesarean section at Santa Marta Hospital on December 10, 1975; petitioner performed the anesthesiology. Ortiz was four feet six inches tall and weighed between 145 and 152 pounds.

Petitioner administered a regional (spinal) block at approximately 10:10 a.m., and surgery commenced at about 10:15 a.m. Approximately five minutes later, Ortiz suffered respiratory arrest and her blood pressure and pulse rate dropped. Resuscitative measures were taken, and the surgeon commenced delivery of Ortiz's baby. The period of time during which Ortiz was deprived of sufficient oxygen and suffered low blood pressure was between three and ten minutes. As a result of the oxygen deprivation, Ortiz suffered some degree of brain damage.

Petitioner chose as an anesthetic an isobaric solution of 1.2 cubic centimeters (cc's) of Pontocaine and .8 cc's of spinal fluid, injected between the L4

and L5 vertebrae. An isobaric solution is one which has the same specific gravity as the cerebrospinal fluid and tends to stay at the level in the spinal column at which it was injected. It usually takes 10 to 15 minutes for an isobaric spinal to fixate, i.e., stop spreading.

By contrast, a hyperbaric solution is one which has a heavier specific gravity than spinal fluid. Once injected, it tends to remain grouped together in the cerebrospinal fluid and, if it spreads, to spread downward to the lowest available space. The hyperbaric solution tends to move slowly; it fixates within 10 to 15 minutes and usually does not move after that.

Dr. Strauss testified isobaric spinals were not commonly used in Southern California in 1975 due to their reputation for being less controllable than hyperbaric spinals, i.e., they were more likely to move up or down the spinal column with slight movement of the patient. If the anesthetic moved upward, it could. result in a high or total spinal anesthetic, blocking the diaphragm and respiration, causing a drop in blood pressure or cardiac arrest, or reaching the brain and causing convulsions or brain damage.

Dr. Strauss assumed Santa Marta was a teaching hospital where surgery was done by residents and patients frequently were repositioned during surgery. In his opinion, the frequent repositioning would call for the use of a hyperbaric rather than isobaric spinal, in that the former was much more controllable.

He also testified a normal, acceptable dosage of Pontocaine would have been .5 or .6 cc's. Ordinarily, for abdominal surgery, Ortiz should have received .8 to 1. cc's, but as a rule of thumb, the dosage for a pregnant patient is halved. Both her height, with a short spinal column, and her excess weight, which would cause compression in the spinal column, also would reduce the amount of anesthetic needed.

Dr. Strauss acknowledged the 1975 Physician's Desk Reference contained no warnings about using Pontocaine in an isobaric solution and recommended a dosage of 1.5 to 2.0 cc's of the anesthetic. However, an ordinary anesthesiologist would reduce that amount by one-third to accommodate Ortiz's short stature and again reduce it by half because she was full-term pregnant, making the proper dosage .5 or .6 cc's. Dr. Strauss was of the opinion petitioner's conduct with respect to Ortiz demonstrated a lack of knowledge and ability due to his use of an excessive amount of Pontocaine, resulting in a high or total spinal.

Petitioner testified volume of the anesthetic solution, rather than dosage of the anesthetic, is the dominant factor in determining how high on the

spinal column the block will travel; dosage is the primary determinant of the duration of the anesthetic block. Based on Ortiz's height, he kept the volume of the solution at 2.0 cc's. He acknowledged he was taught to reduce the dosage of Pontocaine given to a pregnant woman, but denied being taught a rule of thumb was to reduce the dosage by one-half.

Petitioner testified Pontocaine fixates within 10 to 20 minutes after injection, whether in an isobaric or a hyperbaric solution; however, if a hyperbaric solution is used and the patient is placed in a head down position, there would be an increased level of concern and less trust in the fixation process. An isobaric solution would have less tendency to move if the patient's position changed.

Ortiz was a "teaching case," indicating to petitioner surgery would last about two hours rather than the usual 45 minutes. Also, there would be considerably more movement than normally required; additionally, early in the procedure, Ortiz's head would be placed down to provide greater exposure of the abdominal contents. Based on these factors, petitioner chose an isobaric solution for its tendency to remain stationary.

Petitioner testified he injected the anesthetic solution while Ortiz was in a fetal position; after a "significant amount of time," approximately 10 minutes, petitioner thought the anesthetic was fixated at an appropriate level. She was placed on her back in a head-down position for surgery. Approximately five minutes after fixation, after surgery had begun, Ortiz became "shocky," exhibiting symptoms of a high spinal, and resuscitative measures were taken.

Dr. Shwachman agreed with petitioner volume is the most critical factor in determining height of a spinal block while dosage controls the duration and intensity of the block. He agreed 2.0 cc's was an appropriate volume for Ortiz, and the dosage of Pontocaine selected by petitioner also was appropriate. While acknowledging the rule of thumb taught in medical schools that the dosage of Pontocaine be halved for full-term pregnant patients, Dr. Shwachman testified his experience and observation had shown this rule did not work. For intraabdominal surgery lasting 45 minutes or more, a minimum dosage of .8 cc's of Pontocaine is necessary to keep the patient out of pain.

Dr. Shwachman agreed Pontocaine takes about 10 minutes to fixate, but it has a tendency to "creep" over an extended period of time. Looking at the anesthesia record for Ortiz's surgery, which showed the anesthesia was injected at 10:10 a.m. and surgery began at 10:15 a.m., the doctor was of the opinion the Pontocaine was partially fixed at best at the start of surgery.

The doctor admitted isobaric solutions are more difficult to control than hyperbaric. He does not use isobaric solutions for caesarean sections, although he does use them for other types of surgery. He did not think petitioner's choice of an isobaric solution indicated a lack of knowledge or ability possessed by ordinary anesthesiologists in Southern California.

## PROCEDURAL HISTORY

On October 15, 1980, respondent filed an accusation against petitioner, alleging incompetence in violation of Business and Professions Code section 2361, subdivision (d); a first amended and supplemental accusation filed on August 20, 1982 alleged both gross negligence and incompetence, in violation of Business and Professions Code section 2361, subdivisions (b) and (d).[1] All charges were deemed controverted. (Gov. Code, § 11507.)

In December 1983, a hearing was held before Administrative Law Judge Rosalyn M. Chapman. She submitted her proposed decision to respondent, which adopted the decision as its own, to become effective April 30, 1984.

Respondent found, with respect to Janet Halverson, petitioner "was monitoring Halverson's vital signs on a regular basis, approximately every five minutes. However, he was recording Halverson's vital signs on the anesthesia record only every fifteen minutes. [Petitioner] was grossly negligent in failing to record Halverson's vital signs at five minute intervals commencing with the start of the anesthesia." It was not found petitioner in any way caused Halverson's death.

With respect to Rosa Ortiz, respondent found Ortiz suffered permanent brain damage due to a period of low blood pressure and oxygen deprivation during surgery. This period "was the result of a 'high spinal' from the anesthesia administered by [petitioner]. [Petitioner's] treatment of Ortiz demonstrates incompetence and a general lack of skill, ability and knowledge in anesthesiology. More specifically, [petitioner] demonstrated incompetence in selecting an isobaric solution to administer; and in administering a [1.2 cc's] dosage of that solution."

---

[1]Business and Professions Code section 2361, subdivisions (b) and (d), has since been replaced by section 2234, subdivisions (b) and (d), which reads: "The Division of Medical Quality shall take action against any licensee who is charged with unprofessional conduct. In addition to other provisions of this article, unprofessional conduct includes, but is not limited to, the following:

"(b) Gross negligence.

"(d) Incompetence.
"

Respondent determined grounds to revoke or suspend petitioner's license existed under Business and Professions Code section 2234, subdivision (b), in that he was grossly negligent in his actions with respect to Halverson. Grounds to revoke or suspend his license also existed pursuant to subdivision (d) of section 2234, in that petitioner was incompetent in his treatment of Ortiz. Respondent added: "Although one instance of improper treatment of a patient is generally not incompetence, the Administrative Law Judge finds that, in this case, [petitioner's] actions and omissions in the treatment of Ortiz demonstrate a general lack of knowledge, ability and skill in anesthesiology." Respondent ordered that petitioner's license be suspended on both grounds, the suspensions to run concurrently; the suspensions were stayed and petitioner was placed on two years' probation under enumerated terms and conditions.

Petitioner sought a writ of mandate in superior court pursuant to Code of Civil Procedure section 1094.5, challenging respondent's decision; pursuant to stipulation, the superior court issued an order staying respondent's decision until further order of the court. Trial was held on November 8, 1984 and the matter taken under submission; by minute order dated November 13, the court denied the petition for writ of mandate.

On November 16, petitioner mailed a request for statement of decision pursuant to Code of Civil Procedure section 632; the request was returned by the court clerk as untimely. Following correspondence with the court by petitioner, the court issued a minute order on June 27, 1985 denying the request for statement of decision as untimely because it was not made "prior to submission."

CONTENTS

I

Petitioner contends the trial court erred in denying his request for a statement of decision.

II

Petitioner also contends the evidence is insufficient to support the judgment.

DISCUSSION

I

Petitioner contends the trial court erred in denying his request for a statement of decision. We disagree.

Code of Civil Procedure section 632 provides in pertinent part: "[U]pon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. Upon the request of any party appearing at the trial, made within 10 days after the court announces a tentative decision, or if the trial has lasted less than one day, made prior to submission of the matter for decision, the court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial." A hearing on a petition for writ of mandamus is a "trial of a question of fact" for purposes of section 632. (See *Bevli* v. *Brisco* (1985) 165 Cal.App.3d 812, 820 [212 Cal.Rptr. 36].) The relevant question here is whether petitioner's trial lasted less than one day; if so, his request for a statement of decision made after submission of the case was untimely and properly denied.

In *Bevli* v. *Brisco, supra,* the actual hearing on the petition for writ of administrative mandamus took less than one day. At the hearing, the trial court formally admitted into evidence the administrative record; it noted it had read and considered the record, and "[i]t took from 10:00 o'clock yesterday morning until 11:00 o'clock last night and from 6:00 o'clock to 8:00 o'clock this morning to do so, but it has been done." (165 Cal.App.3d at p. 821.) After the matter was submitted and a tentative decision announced, a request for a statement of decision was filed. The trial court denied the request on the ground it was untimely—the trial lasted less than one day and the request was not made before the matter was submitted.

The appellate court observed, in order to determine how long a trial "lasts" for purposes of section 632, it is necessary to determine when it commences and concludes. (*Id.,* at p. 820.) Code of Civil Procedure section 581, subdivision (a) defines the commencement of trial which, in administrative mandamus proceedings, ordinarily is upon the introduction of evidence. (*Ibid.*) However, the record in the case indicated the trial court considered the evidence before it formally was introduced, a procedure typical in administrative mandamus proceedings. (*Id.,* at p. 821.) This preliminary reading of the record "ordinarily constitutes the trial of the action from an evidentiary standpoint, with the express or tacit understanding with counsel that when they later begin to argue the case that they will formally place on the record and into the record the evidence in the form of the administrative transcript and exhibits considered by the administrative hearing officer." (*Ibid.,* fn. omitted.) The time spent by the trial court in reading the record would constitute more than one day's work for most judges, and to conclude the trial lasted less than one day based on the length of the hearing itself would be to ignore the trial court's work prior to the hearing. (*Id.,* at pp. 821-822.) Therefore, the time expended by the trial court in absorbing the evidentiary material for trial must be considered as trial time for the purposes of section 632. (*Id.,* at p. 822.)

In the instant case, the administrative record—five volumes of the administrative transcript and two volumes of exhibits—was lodged with the trial court on September 7, 1984. A brief hearing was held on November 8, 1984, at which time the administrative record was introduced into evidence. The court indicated it had read over the record and the parties' points and authorities, but did not indicate when this was done or how long it took to read the record. The case was taken under submission at the close of the hearing. On November 13, the court issued a minute order containing its tentative decision to deny the writ on the ground there was sufficient evidence to support the findings and the penalty imposed. Petitioner submitted a request for a statement of decision on November 16, but it was returned by the court clerk as untimely. The judgment was entered on December 27, 1984, and petitioner appealed therefrom.

On June 21, 1985, following the decision in *Bevli,* counsel for petitioner wrote a letter to the trial court informing it of the decision and requesting it to notify counsel as to the amount of time expended in reading the record. The court issued a minute order on June 27, denying the request for a statement of decision as untimely, in that it was not made "prior to submission." Counsel for petitioner wrote two more letters to the court, on July 10 and August 28, 1985, explaining his earlier request. By minute order dated September 9, 1985, the trial court indicated it had reviewed the request, but the file did not indicate how much time was spent reviewing the administrative record and the court had no recollection of the amount of time spent. In a subsequent minute order dated November 4, 1985, the court stated the trial—referring to the hearing—clearly lasted less than one day.

Under *Bevli,* trial included not only the hearing but the time spent in reviewing the administrative record. In the instant case, however, unlike the situation in *Bevli,* the record does not reflect the amount of time expended by the trial court in this regard.

■ It is fundamental that an appellant "must affirmatively show error by an adequate record. . . . Error is never presumed. . . . 'A judgment or order of the lower court is *presumed correct.* All intendments and presumptions are indulged to support it on matters as to which the record is silent . . . .' (Orig. italics.)" (*Rossiter* v. *Benoit* (1979) 88 Cal.App.3d 706, 712 [152 Cal.Rptr. 65], citations omitted.) Although petitioner belatedly attempted to make a record which would have revealed the alleged error, he was unable to do so due to the trial court's failure to recollect the amount of time spent reading the administrative record prior to trial. This court cannot speculate as to the amount of time spent. (*Ibid.*) **(1c)** Inasmuch as petitioner has not met his burden of affirmatively showing error on the record, this court must presume the lower court's ruling was correct, i.e., that the trial lasted

less than one day and petitioner's request for a statement of decision was untimely.

## II

Petitioner also contends the evidence is insufficient to support the judgment. Again, we disagree.

■ In administrative mandamus proceedings, the trial court exercises its independent judgment on the evidence before it, while the appellate court merely reviews the record as a whole to determine whether the trial court's findings are supported by substantial evidence. (*Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 135 [181 Cal.Rptr. 732, 642 P.2d 792]; *Rivard* v. *Board of Pension Commissioners* (1985) 164 Cal.App.3d 405, 412 [210 Cal.Rptr. 509].) On appeal, the record is viewed in the light most favorable to the respondent, indulging all reasonable inferences and resolving all conflicts in support of the judgment. (*Id.*, at pp. 412-413.)

■ Evidence is substantial if any reasonable trier of fact could have considered it reasonable, credible and of solid value. (*Id.*, at p. 413; accord, *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 71-72 [64 Cal.Rptr. 785, 435 P.2d 553].) ■ The evidence of one credible witness may constitute substantial evidence. (Evid. Code, § 411; *People* v. *Alcala* (1984) 36 Cal.3d 604 [205 Cal.Rptr. 775, 685 P.2d 1126]; *Thompson* v. *Occidental Life Ins. Co.* (1973) 9 Cal.3d 904, 918, fn. 6 [109 Cal.Rptr. 473, 513 P.2d 353].)

■ In the instant case, there is no statement of decision to reveal the specific findings of the trial court. Therefore, findings of fact and conclusions of law necessary to support the judgment will be implied and the judgment affirmed if supported by substantial evidence. (*Golde* v. *Fox* (1979) 98 Cal.App.3d 167, 173-174 [159 Cal.Rptr. 864].) Additionally, this court may look to the findings in respondent's decision for guidance in determining whether the trial court's judgment is supported by substantial evidence. (*James* v. *Board of Dental Examiners* (1985) 172 Cal.App.3d 1096, 1107 [218 Cal.Rptr. 710].)

A. *Janet Halverson*

Respondent found petitioner "was grossly negligent in failing to record Halverson's vital signs at five minute intervals commencing with the start of anesthesia." ■ Gross negligence is " 'the want of even scant care or an extreme departure from the ordinary standard of conduct.' " (*Cooper* v. *Board of Medical Examiners* (1975) 49 Cal.App.3d 931, 941 [123 Cal.Rptr.

563], quoting from *Van Meter* v. *Bent Construction Co.* (1956) 46 Cal.2d 588, 594 [297 Cal.Rptr. 644].) The use of the disjunctive in the definition indicates alternative elements of gross negligence—both need not be present before gross negligence will be found. (*Gore* v. *Board of Medical Quality Assurance* (1980) 110 Cal.App.3d 184, 196-197 [167 Cal.Rptr. 881].)

■ Dr. Strauss testified petitioner's failure to take *and record* Halverson's vital signs every five minutes constituted an *extreme departure from community standards*. He acknowledged the failure to record was not life-threatening and did not contribute to Halverson's death. Petitioner conceded it was common practice to record vital signs every five minutes, although some hospitals provided for recordation every fifteen minutes. Dr. Schwachman basically agreed with petitioner and considered petitioner's actions to be within the standard of care in the community.

Dr. Strauss was a qualified expert witness, found by both respondent and the trial court to be credible. His testimony alone may provide substantial evidence to support a finding of gross negligence. (*Thompson* v. *Occidental Life Ins. Co., supra,* 9 Cal.3d at p. 918, fn. 6.) Any conflict between his testimony and that of petitioner and Dr. Schwachman must be resolved in favor of the judgment. (*Rivard* v. *Board of Pension Commissioners, supra,* 164 Cal.App.3d at pp. 412-413.)

Petitioner asserts that since his monitoring of Halverson's vital signs was within the standard of care, his conduct cannot constitute gross negligence as a matter of law; to find him grossly negligent in his recordation is to assert form over substance. However, Business and Professions Code section 2234 does not limit gross negligence or unprofessional conduct to the actual treatment of a patient—as opposed to administrative work—and does not require injury or harm to the patient before action may be taken against the physician or surgeon.

For example, an opinion by the state attorney general concludes a physician must complete or maintain hospital patient records when requested by the hospital to do so, or he may face a charge of unprofessional conduct under Business and Professions Code section 2234. (58 Ops.Cal.Atty.Gen. 894 (1975).) While this is not the precise issue here, the opinion does discuss the importance of maintaining complete and proper hospital records. Such records may be necessary in emergencies, or where other physicians may be called upon to treat the patient. (*Id.,* at p. 895.) Incomplete records "interfere[ ] with the ability of Hospital Peer Review Committees to review performance of medical staff and the quality of health care delivery." (*Id.,* at pp. 895-896.) Proper records also may be necessary to protect the legal interests of the patient, hospital or physician. (*Id.,* at p. 896.)

After reviewing the above and other reasons for completing patient records and discussing the definition of "unprofessional conduct," the opinion concludes: "Whether the failure or refusal of a physician to complete or maintain hospital patient records constitutes unprofessional conduct must be considered in connection with the surrounding circumstances and the relationship of such conduct to the practice of medicine. Obviously a physician will not be charged with unprofessional conduct for failing or refusing to dot or cross all the 'i's' or 't's' in a medical chart. However, where as the question presented indicates that the physician is failing or refusing to complete or maintain medical records when requested to do so by the hospital, it can be assumed that the deficiencies are serious and have the potential of or are in fact interfering with patient care or hospital administration. Under these circumstances and given the significance and fundamental importance of maintaining proper patient records and the relationship of such functions and responsibilities to a physician's licensed activity, it is concluded that the failure or refusal on the part of a physician to maintain such records when requested to do so by the hospital can subject the physician to charges of unprofessional conduct under [section 2234]," (*Id.,* at p. 899, fn., citation and italics omitted.)

Dr. Strauss testified as to the reasons behind the five minute recordation rule, which related to the amount of time in which irreversible brain damage could occur. It reasonably may be inferred such recordation is necessary to patient care and hospital administration, being required by most hospitals and a common practice in the medical community. Clearly, failure to record at five minute intervals may be considered related to the physician's licensed activity rather than a mere technical lapse such as "failing to dot or cross all the 'i's' or 't's'." Inasmuch as community standards required monitoring and recording vital signs at five-minute intervals and petitioner's failure to do that was characterized as an extreme departure from those standards, he properly was found to have been grossly negligent in connection with his treatment of Halverson. (*Cooper v. Board of Medical Examiners, supra,* 49 Cal.App.3d at p. 941.)

B. *Rosa Ortiz*

Respondent found petitioner's treatment of Ortiz demonstrated "incompetence and a general lack of skill, ability and knowledge in anesthesiology. More specifically, [petitioner] demonstrated incompetence in selecting an isobaric solution to administer; and in administering a [1.2 cc's] dosage of that solution."

The term "incompetency" generally indicates "an absence of qualification, ability or fitness to perform a prescribed duty or function." (*Pollack*

v. *Kinder* (1978) 85 Cal.App.3d 833, 837.) Incompetency is distinguishable from negligence, in that one "may be competent or capable of performing a given duty but negligent in performing that duty." (*Id.,* at p. 838.) Thus, " 'a single act of negligence ... may be attributable to remissness in discharging known duties, rather than ... incompetency respecting the proper performance.' " (*Ibid.,* quoting from *Peters* v. *Southern Pacific Co.* (1911) 160 Cal. 48, 62 [116 P. 400].) The *Pollack* court concludes: "While it is conceivable that a single act of misconduct under certain circumstances may be sufficient to reveal a *general* lack of ability to perform the licensed duties, thereby supporting a finding of incompetency under the statute, we reject the notion that a single, honest failing in performing those duties— without more—constitutes the functional equivalent of incompetency justifying statutory sanctions." (85 Cal.App.3d at p. 839, italics in original.)

With respect to the selection of an isobaric solution, as petitioner points out, Dr. Strauss never testified petitioner's choice demonstrated incompetence. He did testify, however, isobaric solutions were not commonly used in 1975 due to their reputation for being less controllable than hyperbaric solutions. Additionally, if a patient was to be frequently repositioned during surgery the controllability of the latter would call for its use.

Petitioner testified he chose the isobaric solution because there would be less tendency for it to move toward the patient's head when she was placed in a head-down position. Dr. Shwachman admitted isobaric solutions are more difficult to control than hyperbaric; however, he did not think petitioner's choice of an isobaric solution indicated a lack of knowledge or ability possessed by an ordinary anesthesiologist.

From the foregoing evidence, it reasonably may be inferred petitioner was negligent in his choice of an isobaric solution for Ortiz's anesthesia. In the medical community, isobaric solutions were not commonly used due to the difficulty of controlling them, and Ortiz's surgery required the use of an anesthetic solution that could be controlled due to the need for frequent repositioning. Once again, conflicts in evidence must be resolved in favor of respondent. (*Rivard* v. *Board of Pension Commissioners, supra,* 164 Cal.App.3d at pp. 412-413.)

There additionally was evidence petitioner allowed Ortiz to be placed on her back in a head down position and allowed surgery to begin before the Pontocaine was fixated; prior to fixation, either type of solution will move. It was agreed Pontocaine takes 10 to 15 minutes to fixate. The surgery records indicate the anesthetic was administered at 10:10 a.m., surgery commenced at 10:15 a.m., Ortiz began suffering difficulties at 10:20 a.m. and the baby

was delivered at 10:20 a.m. Looking at this record, Dr. Shwachman testified the Pontocaine was partially fixed at best at the start of surgery, at which time Ortiz already had been moved to a head down position. It reasonably may be inferred petitioner's actions in this regard contributed to the high spinal and constituted negligence. While this evidence was not specifically mentioned by respondent in its decision as support for a finding of incompetence, the trial court properly could have relied on this evidence in making its independent determination of the evidence, and this court may imply findings necessary to support the judgment. (*Golde* v. *Fox, supra,* 98 Cal.App.3d at pp. 173-174.)

With respect to the dosage of Pontocaine selected, Dr. Strauss testified petitioner administered an excessive amount of the anesthetic, resulting in a high spinal. Dr. Strauss opined petitioner's selection of the dosage demonstrated a lack of knowledge and ability. While petitioner and Dr. Shwachman disagreed with Dr. Strauss, it was for the trial court to resolve the conflict. Substantial evidence in the form of Dr. Strauss' testimony supports a finding petitioner demonstrated a lack of knowledge and ability in his selection of the dosage of anesthetic for Ortiz.

Even with substantial evidence to support findings of negligence or lack of knowledge and ability in petitioner's treatment of Ortiz, there still is a question whether these failings rise to the level of incompetency. Respondent found they did, demonstrating "a general lack of knowledge, ability and skill in anesthesiology." While only one patient was involved, there were several acts or decisions by petitioner which were improper. This suggests more than "a single, honest failing in performing [his] duties." (*Pollack* v. *Kinder, supra,* 85 Cal.App.3d at p. 839.) Additionally, the flawed reasoning which led to his decisions to administer a 1.2 cc's dosage of Pontocaine in an isobaric solution may be considered more " 'incompetency respecting the proper performance' " of his duties than merely " 'remissness in discharging known duties.' " (*Id.,* at p. 838.) We therefore conclude there is substantial evidence to support a finding of incompetence in connection with petitioner's treatment of Ortiz.

The judgment is affirmed.

Hanson (Thaxton), J., and Devich, J., concurred.